# Richmond.

## SANFORD JOHNSON v. COMMONWEALTH.

January 17, 1929.

Absent, Chichester, J.

.The opinion states the case.

*Browning & Nottingham,* for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

The plaintiff in error was proceeded against by information filed by the attorney for the Commonwealth in the Circuit Court of Orange county. The information, so far as it is material, reads as follows: "* * * that Sanford Johnson and Hester Lewis on the 6th day of November, in the year 1927, in the said county of Orange, did unlawfully keep, store and have in their possession ardent spirits against the peace and dignity of the Commonwealth of Virginia.

"And the attorney for the Commonwealth aforesaid,

who prosecutes as aforesaid, in the name and by the authority aforesaid, and upon the complaint in writing aforesaid, further gives the said court to understand and be informed that the said Sanford Johnson and Hester Lewis on the 6th day of November, in the year 1927, in the said county of Orange, did unlawfully own and have in their possession two fifty gallon fermenters, one five gallon keg, fifty gallons of mash, two gallons of wine, and other substances capable of being used in the manufacture of ardent spirits."

The accused was found guilty and sentenced to pay a fine of $50.00, and to confinement in jail for a period of thirty days.

The only error assigned is the action of the trial court in overruling the motion to set aside the verdict of the jury because it was contrary to the evidence.

The evidence of the accused was certified in narrative form by the trial court as follows:

"Sanford Johnson testified that he had nothing to do with the liquor or mash at Hester Lewis'; that on the occasion when he was arrested, he went there to pay for an old car that he had bought from Hester Lewis; that he did not know the mash was there; that he had been there about fifteen minutes when the officers came; that he had nothing to do with it; that the home was John Lewis' he supposed; that John Lewis, he thinks, is in Pennsylvania; that John Lewis (husband of Hester) stayed at home during the winters; that when the officers came he, Johnson, was sitting on a chest upstairs and not on the bed with Hester; that he, Johnson, furnished no materials for the mash or liquor, and had no interest in it; that he lived about one-half mile from there, with J. S. Johnson, his father; that he is not married; that sometimes he would be coming to the town of Orange and Hester would ask him if she

could ride with him, and he would tell her that she could; that he has also hauled other colored people; that he has not been handling any liquor and has never sold any liquor; that he pulled his coat off when he went into the house; that Hester laid it in the other room; that the gun found there was not his gun; that Hester said it was hers; that her husband had left it there; that Hester showed him a hawk that she had shot that day; that the shells found on him he used in his father's gun; that he had used it Saturday evening; that he bought the shells he had from Mr. Faudree; that they were Remington shells, he thinks; that he has never bought any liquor and has never sold any.

"On cross-examination, he testified that he bought the car from Hester Lewis in September for $15.00; that he bought it to tear it to pieces; that it was at his father's place; that he paid her $5.00 before he carried it away, and $10.00 on the Sunday he was arrested; that his car was not at Hester's on the day he was arrested; that Hester's husband was home last winter; that he left in the spring; that he was back home in August; that he did pass Hester's house in coming to the town of Orange; that her house is a considerable distance from the road; that he did meet her on the road; that he goes back and forth through the Lewis place in squirrel hunting and also in going to a corn field; that when the officers came he was in the first room upstairs; that it was warm in there; that he, Johnson, doesn't know whether or not there was a fire in there; that when he went there Hester was upstairs; that Hester told him to come on up; that he was warm enough already; that the chest was in the room as he went upstairs; that the shells were already there; that he did not smell any mash at the house; that he did not know what mash smelled like. On

being handed the one-half gallon sample of mash, introduced in the evidence, he testified 'that smells like yeast water;' that the chest in the room was by the window; that he could not say whether or not it could be seen from the foot of the steps. He testified that when arrested at Hester's he told the officers he had just dropped by there; that he told them something that wasn't true, that Hester had nine children he thinks.

"On re-direct examination, he testified that he did nothing to throw the officers off the track;. that he didn't know whether or not any of the doors to the house were locked; that he did not lock them; that there were some children there; that he saw four; that the children went on out in a few minutes, two of them left there; that he doesn't remember going down; that they did have to pass through the room he and Hester were in; that he doesn't know who locked the door; that he heard the men outside; that he heard them knock at the door; that the child said that there was nobody there; that was all he heard it say; that he stopped talking; that he kept quiet as it was not his house; that he did not know who they were; that he and Hester did not ask who it was."

The case of the Commonwealth, as displayed by the record, is as follows: The accused is a white man. Hester Lewis, jointly charged with him, is a colored woman, the wife of John Lewis, and the mother of nine children. It appears that her husband, John Lewis, who worked in Pittsburgh, Pennsylvania, and only stayed at home in the winter time, was the owner of the property in which the ardent spirits involved here were found. The search of the premises was made about one o'clock in the afternoon, on November 6, 1927. The officers knocked on the door several times, but the

only response they received was from a child who
called from one of the upstairs windows that no one
was at home, loud enough for any one in the house to
hear it. The door not being opened, the officers pro-
ceeded to push it open and enter the house. Fletcher,
an officer, started upstairs, and, as he did so, the accused
and the Lewis woman jumped off the bed.

The house contained four rooms, two rooms down-
stairs and two rooms upstairs. The child, who called
out of the window, was in one room upstairs, and the
accused and Hester Lewis were in the other room. The
officers found in the house two barrels, one of them
full of mash, and a five gallon keg with two gallons of
wine in it. The accused's coat was lying on the bed
in the room where the mash was and a single barrel
twelve gauge shotgun was concealed under the cover
of the bed. A number of twelve gauge shells were
found in the accused's pocket. There was no fire in
the room where the accused and Hester Lewis were,
but there was a fire in the other room upstairs and in
the kitchen. The room upstairs, in which the fire was,
contained the mash. The officers also found sugar,
meal, yeast and dried peaches in the house. The odor
of the mash was so pronounced that the officers could
detect it as they approached the house from the out-
side. The accused had been seen around Hester Lewis'
house a great number of times, and had been seen to
haul her up and down the road on the front seat in an
automobile.

George Carter, colored, testified that he had seen the
accused at Hester Lewis' "pretty often," both in the
early morning and evening; that he usually saw him
about six or seven o'clock in the morning and "around
five o'clock" in the evening, but he had never personally
seen him go in and out of the house. The accused's
reputation as a violator of the prohibition law was bad.

Hester Lewis, a witness for the defendant, testified, in substance, that the house belonged to her husband; that the ardent spirits involved in the case belonged to her, and that she had plead guilty to the information filed against her. She also testified that when Johnson entered the house she did not know whether or not he had his coat on, but that he took his coat and gave it to a little girl, and that the little girl carried it into the other room where it was found by the officers.

■ The conflicts in the evidence were settled adversely to the accused by the verdict of the jury, and the case is to be disposed of in the appellate court under the provisions of section 6363 of the Code. That section provides, *intef alia*, that when a criminal case is tried by a jury, and a party excepts to the action of the court in refusing to set aside the verdict of the jury, on the ground that it is contrary to the evidence, the judgment of the trial court shall not be set aside, unless it appears from the evidence that such judgment is plainly wrong, or without evidence to support it.

■ ■ The case presented by the Commonwealth is wholly dependent upon circumstantial evidence. In every such case the evidence must be scanned with great caution and can never justify a verdict of guilty unless the circumstances proved are of such a potent character as to produce in a fair and impartial mind a moral conviction of the guilt of the accused beyond every reasonable doubt. *Kibler's Case*, 94 Va. 804, 813, 26 S. E. 858. On the other hand, such evidence, if legal and competent, is entitled to the same weight as direct testimony, and, when the time, place, means, opportunity, motive and conduct of the accused all concur in pointing out his guilt beyond a reasonable doubt, a jury should return a verdict of guilty, even though the evidence is purely circumstantial. *Sutton's*

*Case,* 85 Va. 135, 7 S. E. 323; *Brown's Case,* 97 Va. 793, 34 S. E. 882; *Longley's Case,* 99 Va. 811, 37 S. E. 339; *Graham's Case,* 140 Va. 457, 124 S. E. 429.

As shown by the record, four witnesses testified that the accused had the reputation of being a violator of the prohibition law. Though the accused testified that he did not know what "mash" smelled like; that he did not smell any mash at the house of Hester Lewis, the proof is conclusive that the officers could smell the mash before they entered the house. In the house the officers found two fifty-gallon fermenters, fifty gallons of mash, two gallons of wine, a quantity of sugar, meal, yeast and dried peaches, and also found a twelve bore shot gun in a bed close to the mash, a coat belonging to the accused, in the pocket of which were found twelve bore shotgun shells.

That the jury refused to accept as true the statement of the accused that he was merely a casual visitor to the home of Hester Lewis, for the purpose of paying a debt, is not startling, in view of the evidence of George Carter, who testified that he lived within two hundred yards of the home of Hester Lewis; that he had seen the accused at the Lewis home "pretty often;" that while he never saw him go in the house, that he has seen him there at six or seven o'clock in the morning; that he has seen him there "around" five o'clock in the evening. From this evidence the jury were warranted in drawing the inference that the accused was not on a casual visit when arrested.

The witness Faulconer stated that he had seen the accused and Hester Lewis driving in an automobile "frequently within the last twelve months."

Hester Lewis admitted that she told her child to tell the officers that she was not at home. This false

statement the jury had a right to weigh against the statement that she was the sole owner of the mash and fermenter.

When we consider the evidence as a whole, we are unable to say that "the judgment of the trial court is plainly wrong and without evidence to support it." There being no error in the judgment of the trial court, it will, therefore, be affirmed.

*Affirmed.*