# Wytheville.

WILLARD BALLARD V. COMMONWEALTH.

June 18, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Crumpler & Crumpler* and *John Henry Powell,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

John H. Babb was a farmer and had lived all his life in. Nansemond county, with whose people he was widely connected by blood and marriage. Willard Ballard was one of the superintendents. of a manufacturing company in Suffolk, and had lived in that town for several years, but for about a year preceding the commission of the offense here charged lived in the county and was one of Babb's neighbors. They were not intimate. Both were married and had families.

On the night of May 4, 1930, both attended divine services

at Cypress chapel. After services Babb drove off in a Ford sedan. By him sat Charles F. Rawles, a neighbor and friend. On the rear seat were Mrs. Babb, her ten-year-old daughter and Mrs. Charles F. Rawles. Mrs. Rawles was not well, and so this machine was driven slowly home down an ordinary county road. Not long after its departure, Ballard followed in his Chevrolet coach. With him were his wife and sister, Mildred Ballard. They overtook the Babb car about midway between Cypress chapel and the Babb home, and signalled repeatedly for the road. This signal was not heeded and, from the evidence of those in the Ford sedan, was not heard. The Chevrolet coach then followed in the dust for some distance when it attempted to pass, and in doing so grazed a telephone pole and was slightly damaged. It ran on for eighty or a hundred yards and stopped on the right hand side of the road.

Charles F. Rawles, who was in the car with Babb, has testified on behalf of the Commonwealth. In substance, he said that when Babb came up to the Ballard car he stopped practically opposite to it and on the left hand side of the road. Ballard then said to him: "Johnnie Babb, didn't you hear me blow my horn?" Babb answered: "No, sir." Ballard then stepped out of his car on its left hand side and said: "You heard me blow and instead of getting out of the road you drove faster." He then walked around in front of the Babb car and had reached its left light or fender when Babb got out of his car and on its left hand side also, and walked or backed to the rear end of the Ford car with Ballard following him. About this time Rawles also got out of the Ford car on its right hand side and started to the rear where these men were or were going. He said to Ballard: "I didn't hear you blow and nobody was hurt, and it looks as if you had just as well get in your car and go home."

When Rawles reached the rear end of the Ford car, Ballard "was standing in front of Babb and by the time I got there he was shot." Immediately before the shooting Babb said:

"If you didn't have on your glasses I would slap you." Ballard answered: "Slap." "He told him to slap and he fired that second." "He fired just as quick as a man could fire." Babb fell. Rawles went to him. Ballard then drove off when Rawles exclaimed: "Don't let that * * * get away after shooting a man down in the road." This was the only occasion upon which any obscene or abusive language was used by either of these men.

At the moment of the shooting, or when Ballard's purpose to shoot became manifest, there was unquestionably excitement and confusion. Before then there was no occasion for excitement.

Mrs. Rawles, who was also in the Ford car, heard her husband tell Ballard that they did not hear his horn, and that the best thing he could do was to get into his car and go home. She heard no cursing and saw nothing like a weapon in the hands of either Babb or her husband. She was asked: "Did they stay behind the car some time before the shot?" and answered: "No, sir. It was just about as soon as he could finish that sentence (her husband's advice) that I heard the shot fired."

Mrs. Babb has also testified. She said: "He passed us and stopped ahead of us on the side of the road, and as he drove up he said: 'Hey, Johnny Babb, didn't you hear me blow?' He said: 'No, sir; I didn't.' He said: 'You did;' and he said: 'I didn't.' He got out of the car and walked around the front of ours, and Johnny got out, my husband, got out on the other side and walked to the back of the Ford, and Mr. Ballard followed him, and he hadn't more than got to the back when the shot fired. I got out and ran in time to see him fall at my feet."

She heard no profanity and saw no weapons in the hands of her husband or Rawles.

Nell Babb, a ten-year-old daughter of the deceased, heard Rawles say: "Ballard, there is no harm done. Why don't you

get in your car and go home?" She also said: "He (Ballard) drove and passed us, and stopped, and he called to my daddy, 'Johnny Babb, didn't you hear me blow?' and my daddy said: 'No, I didn't hear you;' and he said: 'You did;' and he said: 'No, I didn't, and he got out and slammed the door and walked around our car on the side my daddy was on, and my daddy got out and my daddy got to the back of the car, and Willard Ballard followed him, and when I heard the shot go off I got out of the car and I went around, and I screamed and cried and my mother did the same, and that is all I know."

Henry Parker was the officer who made the arrest. His evidence is that Ballard on that occasion said to him that Babb struck him and staggered him, and that "after I caught myself and come back, I saw Mr. Charlie Rawles coming in front of the car with a pocket knife in his hand and I reached in my pocket and got my gun and shot as quick as I could." When told that Babb was dead, he said that he was awfully sorry. "That has always been my fault—too quick tempered."

Lynnwood Branch was aiding Parker in this arrest. He also heard Ballard say: "Well, that has always been my failing. I have been most too quick tempered. I am very sorry but it is too late." This witness also said: "Mr. Parker asked him why did the trouble occur. He told him that he was coming from church, and he drove up behind Mr. Johnny Babb just before he got to the Coast Line road, and blew his horn for Mr. Babb so he could pass, and Mr. Babb never gave him no right of way. After they crossed the railroad he blew his horn again. Mr. Babb still didn't give him no right of way, and he said that he drove by him and thought that he had room enough, and he crowded him in a ditch and the car hit a telephone pole. He said that he passed on after a while and stopped. He got out of his car, and when Mr. Babb drove up asked Mr. Babb why was it that he wouldn't give him any right of way, and Mr. Babb told him that he had not heard him blow. He said: 'I blew for you before I crossed the Coast Line

and after I crossed the Coast Line.' From there they got into an argument. Mr. Babb got out of his car and pulled off his coat and told Mr. Ballard that he would whip the hell out of him if he would pull off his glasses. Mr. Ballard said he pulled off his glasses and stuck them in his coat pocket. He said by that time Mr. Babb had struck him under the right jaw and staggered him back. About the time he got on his feet to balance himself and got straightened out, he saw Mr. Charlie Rawles advancing on him with a pocket knife open, and he said he reached back in his pocket and pulled out his gun and shot him."

The defendant contends that he stopped his car for the purpose of ascertaining what damage it had suffered, and not for the purpose of speaking to those in the car which he had passed; that when the Ford car did drive up and while all of the occupants were still in their respective cars, he said to Babb: "Doc, did you hear my horn blowing?" Babb answered: "Yes." He then asked him: "Why didn't you give me the road?" Mr. Rawles then spoke and said: "Yes, we heard it." Whereupon, he again asked: "Why didn't you give the road to pass?" Babb answered: "I did," to which Ballard replied: "You got me into the ditch and caused me to strike the telephone pole." Babb said he was a "God damn liar." Ballard answered: "Here are my wife and sister in here and don't be cursing before them." Rawles said: "The whole road don't belong to you;" and Ballard answered: "I don't want it all, but enough to pass, and that is all I was blowing for." Up to this time no one had gotten out of either car. Babb then got out, went to the rear of his car and took off his coat and said to Ballard: "Get out of your car and pull your God damn glasses off." In answer to this invitation, he did get out of his car, and in the act of doing so Babb struck him and knocked him against it and struck at him again but missed him. At that time Charles Rawles got out and began to open his pocket

knife, and that in these circumstances he reached under his blanket which covered the driver's seat and took out his pistol.

His statement is: "I was right against the door of the car. Mr. Rawles was getting out of the car and was opening his pocket knife. I reached around in the car door in that blanket and pulled the gun out on my side. Mr. Babb had stepped back by the door of his car, just about. I reckon that is where he was. I was not watching him at the present time, but was watching Mr. Rawles on the other side of the door from him. I backed back from the car and stopped like that to get both men in front of me. Mr. Rawles was following me all the time with the knife and saying: 'You God damn * * *, I will cut your God damn guts out;' and I said: 'Stand back.' I came around, and by that time Babb attacked me again. I was sidling around to the side and Rawles was following me, and they were coming up shoulder to shoulder about like that. That put me out this way (illustrating). About that time Mrs. Lee Rawles and Mr. Rawles and James Ellis drove up. When they drove up they saw there was an argument or something going on. Both were cursing and arguing pretty rapidly. About that time Mr. Rawles made the statement and said: 'You God damn * * *, I will cut your guts out,' again. I stepped back and said: 'Stand back and don't hit me no more.' About that time she ran up and threw her hand against Johnny Babb's shoulder and threw the other in across me here and hollered: 'Johnny, don't hit him.' About that time he passed another lick right at my jaw again, knocking me back probably a step or two; I don't know how many; and just as I went back I had the gun by my side, and just as I went back I fired at that time. I had held my temper and hadn't gotten mad any at all because I knew there were two great big men against one, and I nothing but a small man, and I knew Mr. Babb could whip as many as two or three of me with his fist, and Mr. Rawles was following with the knife, and at that time I got so frightened and maybe I didn't know what else to do, and

I felt there was nothing else for me to do but fire to scare them, so I could go ahead."

This account of the homicide is in a measure sustained by the evidence of Mrs. Ballard, Miss Mildred Ballard, R. L. Rawles, Mrs. R. L. Rawles and James Ellis.

Babb's coat was off and was lodged on the rear of his automobile, and the shot that killed him struck Mrs. Lee Rawles on the thumb.

It is utterly impossible to reconcile these conflicting statements. Certainly everybody was not telling the truth all of the time. All of these things the jury may have believed; they are supported by evidence. Ballard was quick tempered and was fretted by having to follow in the dust Babb's slow-moving car on a narrow country road. His irritation was increased by Babb's failure to heed his signals and was augmented when his car, in passing, struck the telephone pole. The cumulative effect of these irritants caused him, after he had gone some little distance ahead, to stop that he might have it out with the offender.

The jury may have disbelieved him when he said that he got out to see what was the matter with his automobile, for there is no evidence to show that he undertook to make an examination then or afterwards. They may also have believed that in preparation for eventualities he took his pistol from the blanket in which it was wrapped and put it in his pocket. Certainly if this was done, it was not done to help him in the examination of his damaged car, but in anticipation of trouble. Moreover, there was no reason to anticipate trouble unless he intended to precipitate it.

If the jury further believed that when Ballard charged Babb with failure to give him the road he received a civil answer, and that Ballard, instead of accepting it at its face value, continued to charge Babb with discourtesy, got out of his car and came around in front of the Babb car and followed Babb, who had alighted, to its rear, and shot him down when Babb threat-

ened to slap him if he would take off his glasses, and that neither Babb nor Rawles were armed and were not abusive, then they should have returned a verdict of guilty.

All of this is supported by testimony not inherently improbable and ample, if credited, to support a verdict to that effect.

On the other hand, the jury might have believed the defendant and have believed all that witnesses said who testified on his behalf. If their account of this homicide is substantially accurate, Ballard is not guilty at all.

■ We have here a jury's verdict, approved by an able and unbiased trial judge. Such a verdict should not be set aside in this court merely because, as an original proposition, we might have reached a different conclusion. We sit as an appellate court and not as a jury.

"The appellate court will not be justified in granting a new trial, even if its members should think that if they had been on the jury they might have found a different verdict." *Thomas' Case*, 106 Va. 855, 56 S. E. 705; *Cobb* v. *Commonwealth*, 152 Va. 953, 146 S. E. 270.

In *Johnson* v. *Commonwealth*, 152 Va. 973, 146 S. E. 260, 262, Judge Chichester said: "The conflicts in the evidence were settled adversely to the accused by the verdict of the jury, and the case is to be disposed of in the appellate court under the provisions of section 6363 of the Code. That section provides, *inter alia*, that when a criminal case is tried by a jury, and a party excepts to the action of the court in refusing to set aside the verdict of the jury, on the ground that it is contrary to the evidence, the judgment of the trial court shall not be set aside, unless it appears from the evidence that such judgment is plainly wrong, or without evidence to support it."

Measured by this rule, we cannot undertake to interfere with this judgment. We cannot say that it is without evidence to support it; that is, substantial evidence and evidence not inherently improbable.

Error is assigned because of the grade of the offense, as ascertained by the verdict.

This instruction was tendered on behalf of the accused and refused by the court: "The court instructs the jury that the facts and circumstances in this case justify you in determining whether or not the accused was guilty of manslaughter and you cannot consider in reaching a verdict any other crime."

It told the jury that there was no evidence before them which could bring this homicide into the realm of murder.

The court did tell the jury: "If you believe from the testimony in this case that the accused shot the deceased in heat of blood or passion suddenly and immediately brought about by reasonable provocation and without malice aforethought, then you are further instructed that the shooting of the deceased by the accused, even though death resulted, could not constitute any higher offense than voluntary manslaughter."

The court further told the jury "that in considering whether the accused acted in self-defense or not, you should consider the situation as it reasonably appeared to him at the time." From which it is plain that in proper form the court told them that they could not find the accused guilty of murder if they believed that he acted in heat of passion brought about by reasonable provocation or in self-defense. The existence in fact of these extenuating circumstances was, of course, left to the jury. The grade of the offense must be determined by them. *Webb* v. *Commonwealth,* 154 Va. 866, 152 S. E. 366.

Every unlawful homicide is presumed to be murder in the second degree, and so, of course, presumed to have been the result of malice, expressed or implied. To reduce the offense to manslaughter, the burden is upon the prisoner.

In *Sims* v. *Commonwealth,* 134 Va. 752, 115 S. E. 382, 387, the court said: "This statement of the law is hoary with age and has been followed without criticism or objection in this jurisdiction for nearly a century. A partial list of the cases in which it has been approved is given in the margin. If in its

practical application it had proved unfair or injurious to persons accused of homicide, it is more than probable that the fact would long ago have been discovered by the bar and the bench. It has proven satisfactory in the administration of justice and not hurtful to those accused of homicide, and we have no disposition to depart from it." *Mercer* v. *Commonwealth*, 150 Va. 593, 142 S. E. 369.

Moreover, it is to be remembered that malice is a state of mind, not to be established as is a monument, but to be deduced from attendant circumstances, and this deduction is, as we have seen, a jury function.

It is perfectly true that where homicide occurs in the course of a sudden quarrel, mutual combat, or upon sudden provocation, and the killing is from passion growing solely out of the provocation, the offense is manslaughter and not murder. *Richardson* v. *Commonwealth*, 128 Va. 691, 104 S. E. 788. In such a case, the test of whether the killing is from sudden heat of passion is found in the nature and degree of provocation and the manner in which it is resented (*Read's Case*, 22 Gratt. [63 Va.] 924), and it is settled law that slight provocation does not suffice. Both passion and adequate provocation must co-exist before murder is reduced to manslaughter. *Honesty's Case*, 81 Va. 289; *Hannah* v. *Commonwealth*, 153 Va. 863, 149 S. E. 419.

In *Jacobs' Case*, 132 Va. 681, 111 S. E. 90, 93, Judge Kelly, approving, said: "In Minor's Synopsis of Criminal Law, page 46, it is said that the provocation, in order to extenuate homicide to manslaughter, must be such as to have 'actually excited strong passion, so as to have temporarily unsettled the reason. Adequate provocation and ungovernable passion must concur,' citing several Virginia cases."

Neither sharp words (*Reynolds* v. *Com.*, 133 Va. 760, 112 S. E. 707), nor abusive language (*Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382), is sufficient. Provocation cannot avail and self-defense cannot avail where the accused

has wrongfully occasioned the necessity for the homicide. *Vaiden's Case,* 12 Gratt. (53 Va.) 717; *Carr* v. *Commonwealth,* 134 Va. 656, 114 S. E. 791.

Certainly, in murder, malice must appear, but every unlawful homicide is presumed to be murder in the second degree, and since it is presumed to be murder, malice is likewise to be presumed. But it is not necessary in this case to resort to presumptions. If the jury believed that those things occurred which they might have believed did occur, we have adequate proof of actual malice. If, tracing this trouble to its source, they were of opinion that Ballard was at fault and was the aggressor from its inception, no other verdict than murder could logically have been returned. And even if they believed that he was without fault in precipitating this quarrel, that could not avail if they further believed that he shot Babb merely because he threatened to slap him. Such an excuse in such circumstances is not sufficient to shift the burden of presumption attendant upon an unlawful homicide.

Error is assigned because the court refused to quash the venires. There were two of them. On May 1, 1930, and prior to the May term of the Circuit Court of Nansemond county, a *venire facias* issued for "the trial of Henry Brinkley, *et als.,* who stands charged with a felony." We do not understand that any complaint was made of what was then done.

This jury so summoned was competent to try all felonies and misdemeanors which might be tried at said term. Afterwards and during that term the trial judge excused a number of these original veniremen, some because they lived near the scene of the homicide and others at their request and for reasons which he deemed adequate. In this way the original venire was reduced to ten. It became evident that there would not be "a sufficient number of jurors to constitute a panel free from exception," and on June 4th he selected "from the names on the list" fifteen additional veniremen, and directed that a

*venire facias* issue summoning them that there might be "twenty free from exception." Code, section 4896.

In the statement of his exceptions as to what had been done, counsel said:

"The only complaint that we can register as to that, and I desire to do it in the most courteous kind of fashion on account of my client, is that it ought to have been done under the law in our presence. We know the motive that inspired your honor in doing it was the very purest because we know what you had in your mind, and that was to have the trial heard by people who were not closely in touch with any criticism on the one hand or any approval of the act on the other hand."

And again: "And certainly there is nothing we mean as criticism of any jury who has been drawn. So far as the jurors are concerned, there is not a question that we could raise as to any one."

"No irregularity in any writ of *venire facias* or in the drawing, summoning, returning, or impanelling of jurors, or in making out or copying or signing or failing to sign the list, or in drawing more persons than four in excess of the number to be summoned, shall be cause for summoning a new panel or for setting aside a verdict or granting a new trial, unless objection thereto, specifically pointed out, was made before the jury was sworn, and unless it appears that such irregularity, or error, or failure, was intentional or such as to probably cause injustice to the Commonwealth or to the accused; and no judgment shall be arrested or reversed for the failure of the record to show that there was a *venire facias*, unless made a ground of exception in the trial court, before the swearing of the jury." Code, section 4895.

In *Palmer* v. *Commonwealth*, 143 Va. 592, 130 S. E. 398, 400, Prentis, P., said: "We have construed this statute in *Jarrell* v. *Commonwealth*, 132 Va. 551, 110 S. E. 430, and *Wallen* v. *Commonwealth*, 134 Va. 779, 114 S. E. 786, and held it fully effective. The only reason we have thought it

necessary to say anything more about it is to emphasize what we have there said, so as to save the learned counsel and ourselves from further repetitions about such objections. We propose to bear that statute in mind and to require those who rely upon insignificant irregularities to show either abuse of power or some other substantial injustice to the accused."

■ Here no damage was suffered and none is claimed. No settled rule of law has been violated and no imperative statute has been disregarded. Even if we were to concede irregularity in the procedure adopted, it was not injurious, and so not important.

"It has been well said that there is no such thing as a perfect trial. Every man is entitled to a fair trial and to nothing more, and so out of the necessities of the case, and out of the imperative demands of common sense, has grown the doctrine of harmless error." *Oliver* v. *Commonwealth,* 151 Va. 533, 145 S. E. 307, 309.

It is contended that no juror on the original venire could have been excused at a time when neither the accused nor his counsel was present; that he who is excused must be among "those summoned and in attendance," and, so far as we have grasped this claim, it is contended that "those summoned and in attendance" are those who were present at the beginning of the term and not when the case was called for trial (Code, section 4896) ; that those present in the first instance must be present at the second, and only then can be excused.

Such a construction of this statute would make it unworkable. Ordinarily but one jury is summoned to one term of a court, and where many cases are to be then tried it would be necessary, before a juror could be excused, no matter how imperative the reasons therefor might be, that every defendant charged with crime come into court, those in jail and those on bail, and if this were not done, a juror who for adequate reasons was excused from a trial held on Monday, would have to be again in court to be again excused from a trial held on

Tuesday. It would make it practically impossible, in many instances, for a judge to excuse a juror for the term—a power, if not heretofore universally conceded, uniformly exercised.

Jury service is onerous at best, and should be lightened whenever it is possible to do so without harm to litigants, to the end that good men may be secured. Moreover, it might be perfectly apparent that certain jurors on the list were ineligible, and yet the court would have to retain them until the day of trial, and when they were excused adjourn over until new jurors could be summoned to make up the panel—a procedure which would necessitate needless delay in unnumbered cases.

We think "in attendance" means those who were in attendance when the case was called, and that this was in Judge Sims' mind when, in *Rudd* v. *Commonwealth*, 132 Va. 783, 111 S. E. 270, 274, he said: "It does not appear from the record before us how many of the nineteen persons summoned, as aforesaid, under the first *venire facias*, or how many of the thirteen summoned under the second *venire facias*, attended court in accordance with their summons, or were still in attendance upon the court on March 7th, when the jury was selected in the case in judgment."

That is to say, that the necessities for a second *venire* are not necessarily measured by those originally in attendance in accordance with their summons. Before the case is called, it may plainly appear that enough of the original *venire* to make up a jury from it will not be present. In such a case, the trial judge, in his discretion, may at any time cause another *venire facias* to issue.

The second *venire* is made up by the judge from "the list provided for by sections 5988 and 5990," and is not "drawn from the jury box." Code, section 4896. These provisions were observed in this case.

The right of trial judges to excuse jurors in proper cases has been so long recognized and so long exercised that this

construction of the statute, if it were a matter of doubt, is settled by usage.

"So also the practical construction given to a statute by public officials, and acted upon by the people, is not only to be considered, but, in cases of doubt, will be regarded as decisive. It is allowed the same effect as a course of judicial decision. The legislature is presumed to be cognizant of such construction, and when long continued, in the absence of legislation evincing a dissent, the courts will adopt that construction." *Smith* v. *Bryan, Mayor,* 100 Va. 199, 40 S. E. 652, 654; *City of Norfolk* v. *Bell,* 149 Va. 772, 141 S. E. 844.

Objection is made to the competency of three jurors, C. D. Jordan, S. L. McClenny and A. J. Jolly.

Mr. Jordan was examined at some length. He said that he was connected neither with Babb nor with Ballard and knew neither of them. He had read an account of this tragedy in a Norfolk newspaper—*The Virginian Pilot*—and had talked a little with others on the subject, but not much. He said that, assuming the facts to be as stated in that newspaper's account of the homicide, he had formed an opinion, but he further said that he could go into the jury box and give both the Commonwealth and the accused a fair and impartial trial. At the conclusion of his examination, in answer to a question by the court, he said: "I say all I know is what I read in the paper and I think I could give him a fair trial, but Mr. Crumpler asked if my opinion would be fixed if it was like I read in the newspaper, and I said it would."

Mr. McClenny knew neither the deceased nor the defendant, but he had read an account of the facts in this case in *The Virginian Pilot* and in a Suffolk paper, and had heard it discussed several times. From this he said that he had formed an opinion. He was then pressed as to its extent, and said: "Well, if I were to go into the case I would go as a friend to both sides because I don't know anybody and my position would be fair if I could get there." He was finally asked by

the court: "I don't want you to say what your opinion is, but I understand you heard this matter discussed, and if the facts you heard and the account that they gave you formed some opinion, as every man would do, suppose you go into court to-day and hear a different case, would you be influenced by that discussion you heard back at home, or somewhere, in the light of the evidence here where the facts are different?

"Mr. McClenny: No, sir; I feel I would be inclined to decide it on what I have heard in court."

Mr. Jolly also said that he had formed an opinion: "Nothing more than what I got from the newspapers" and from neighborhood discussions. After having stated that he had formed an opinion, Mr. Crumpler asked him: "Could you, with the opinion you have, go into the case with an absolutely open mind?" to which he answered: "I think so. As I said, all the opinion I have is practically from the newspapers, and you know about how much you can count on as a rule." He was examined by the court: "As I understand, Mr. Jolly, you have read the newspapers, and saw certain accounts given there of how a thing happened, and from that account you have an opinion?

"Mr. Jolly: Yes, sir."

Mr. Jolly, did not know these principals.

In *McCue* v. *Commonwealth,* 103 Va. 870, 49 S. E. 623, 625, Judge Keith, in commenting upon the competency of a juror, said: "No man can read the rigid examination to which this juror was subjected without being impressed with his fairness, with his desire to deal justly by the prisoner, and with his conscientious purpose to discharge his duty as a citizen."

All of this can be said of these gentlemen.

If intelligent jurors are to be secured, then there must be some relaxation of rules as to their competency. Most intelligent men and all educated men read newspapers, and they would have to be more than human if they did not form some opinion from accounts which they give of homicides like this,

locally of intense interest to everybody. To reject them for this reason is to put a premium upon ignorance. What these men in substance say is that they have opinions based upon what they have read, but that they can go into the jury box and give fair judgment on the case as it is unfolded during the progress of the trial. More than this could not be expected from honest men of good intelligence.

 Where, as here, jurors are examined in detail both by counsel and by the judge, the rule that a judge's judgment should be given weight applies with particular force. He, better than anyone else, can gauge their candor and their purpose to give fair judgment on the evidence.

 Complaint is made because the court permitted the Commonwealth to prove that the accused, on specific independent occasions, had carried a concealed weapon, and that these occasions were unrelated to and unconnected with the crime charged against him. Ordinarily, such evidence would be plainly incompetent. The accused himself laid the foundations for its admission. He undertook in chief to account for his possession of a pistol on the night of the homicide. He said that his work required that he travel to and from his home at night and that he carried it in a blanket "right behind me where the blanket bags down between the seats at the back of the seat." He was asked:

"Q. Did you ever carry it in your pocket or on your person?

"Q. Absolutely you did.

"A. I did not. I never carried it in my pocket anywhere."

His wife, on direct examination, was asked:

"Q. Have you ever known your husband to have a pistol and carry it around in his pocket?

"A. No, sir; he did not."

After this evidence of the custom of the accused had been admitted over protest, this colloquy occurred between court and counsel:

"Mr. Crumpler: Now, if your honor pleases, I will read

you from Greenleaf on Criminal Evidence. Your honor will remember that in the *Griffin Case* the same question arose, and you ruled on the same question in favor of the defendant. Of course, it has been many years and you may have learned a great deal more since then.

"The court: I have no quarrel with your authority, the authorities you have given, but I don't think they have any application to this particular case. It is not a question of general impeachment as to character, but he was asking him about specific instances to disprove a statement he has made heretofore—that he didn't carry a pistol on his person.

"Mr. Crumpler: Don't your honor recognize the fact that particular instances as to carrying a pistol is an immaterial matter in so far as this case is concerned?

"The court: No, I don't recognize that fact. He is trying to show that this man makes incorrect statements, and he can do that by proving that the very statement he made about never carrying a pistol is not true, if he can prove it.

"Mr. Crumpler: If that is true, its only probative value would be to contradict the witness in that particular.

"The court: Why, certainly."

It was competent for the reasons stated and for the purpose stated. *Harris* v. *Commonwealth,* 129 Va. 751, 105 S. E. 541; *Clark* v. *Commonwealth,* 90 Va. 360, 18 S. E. 440; *Williams* v. *Commonwealth,* 128 Va. 698, 104 S. E. 853.

▆▆▆ Exception is taken to the fact that the court permitted the jury to carry to their room certain statements which it is said were not introduced in evidence. These statements appear in the record as exhibits 1 and 3. Exhibit 1 was signed by Mrs. R. L. Rawles, *Mrs. R. L. Rawles* and James Ellis, and exhibit 3 was signed by Mrs. J. W. Ballard and Mildred Ballard. They were procured by the Commonwealth's attorney from the witnesses who signed, and it is claimed that the statements there made differed from those made by these subscribing witnesses when they came to testify. Of course, if they

were not introduced in evidence, they should not have been taken by the jury to their room. If they were, this assignment is without merit.

Code, section 6257, provides: "Papers read in evidence, though not under seal, may be taken from the bar by the jury."

Mrs. Ballard and Miss Ballard were both cross-examined at length as to statement exhibit 3. In the course of Miss Ballard's cross-examination counsel said: "I want her to read the whole statement and introduce it." This, then, appears in the record:

"Note: The statement taken by Mr. Godwin from Mrs. Ballard is marked exhibit No. 3.

"Thereupon, the court adjourned until 8:00 o'clock this evening."

· Exhibit No. 1, signed, as we have seen, by Mrs. R. L. Rawles and James Ellis, was dealt with in this wise, as appears from the record:

"Thereupon, at 10 P. M., an adjournment is taken to June 21, 1930, at 10 A. M.

"Note: Just after court adjourned at ten, and before the judge and counsel had left the courtroom, or the reporter had left his seat, the Commonwealth's attorney handed the reporter the statement signed by Mrs. G. F. Rawles, G. F. Rawles and James Ellis, heretofore referred to, stating he wished it put in evidence and requested that it be marked as an exhibit."

In this connection it is to be noted that later on the court certified in describing exhibit No. 1 that it was signed by Mrs. R. L. Rawles, R. L. Rawles and James Ellis, while the exhibit itself, as copied into the record, purports to have been signed by Mrs. R. L. Rawles, *Mrs. R. L. Rawles* and James Ellis. How this confusion has come about we do not know, but there · was only one signed exhibit 3 sent to the jury room. Mr. Ellis signed it, for he so testified. Mr. R. L. Rawles said he signed it and Mrs. R. L. Rawles signed it.

From the petition for a writ of error it appears that the

stenographer, in his notation of the adjournment to June 21st, was dealing with this exhibit 3. He simply made a mistake in the initials of the Rawles who signed it. These confused statements deal with the same paper. It was used in the cross-examination both of Mrs. Rawles and of Mr. Ellis. Mrs. Rawles said: "You have got the truth in this statement, the whole truth, and my husband and I have told it straight." And Mr. Crumpler, in redirect examination, read it over section by section to Mr. Ellis and questioned him in detail about the statements there made. We think the inference that it was read in evidence is irresistible, and from this it follows that there could be no valid objection to its challenged use.

In support of a different conclusion, we are cited to *Wilson v. Wooldridge,* 118 Va. 209, 86 S. E. 872. There certain checks and notes were identified as bearing the signatures of one of the defendants. They were by plaintiff's counsel handed to the jury for comparison of signatures. Objection was made, but before the court had an opportunity to rule on it they were withdrawn from their consideration. Having been withdrawn, they were, of course, not in evidence, and it was properly held that they could not be sent to the jury room. Here there is no suggestion that these two papers were not in evidence until after the jury had taken them.

The next assignment deals with instructions. Five were given for the Commonwealth and twelve for the accused. Twenty-one tendered on his behalf were refused. The court might well have refused them all. Instructions are given that they may aid the jury in reaching a proper verdict. That thirty-three instructions could have been of any assistance to them is not probable.

"The piling of instruction upon instruction does not help the jury and treads close upon the heels of invited error." *Nelson v. Commonwealth,* 153 Va. 909, 150 S. E. 407, 413.

The trial court might, after their rejection, have itself instructed the jury as to the law which bore upon the particular

facts in evidence, or it might have directed that they be entirely rewritten and so limited.

Particular objection is made to instruction 2, given at the instance of the Commonwealth. That instruction reads:

"The court instructs the jury that where death ensues on a sudden provocation, or sudden quarrel, without malice, the killing is manslaughter, and in order to reduce the offense to killing in self-defense, the accused must prove two things, viz: (1) That before the mortal wound was given, he declined further combat, and retreated as far as he could with safety;. and (2) that he killed the deceased through the necessity of preserving his own life or to save himself from great bodily harm, or that there was reasonable ground to believe that the killing was necessary to preserve his own life or to save himself from great bodily harm."

 The theory of the Commonwealth in this case is that Ballard brought about the encounter.

"If a sudden fight is brought on without malice or intention, the accused, if in fault, must retreat as far as he safely can, but, having done so and in good faith abandoned the fight, may kill his adversary, if he cannot in any other way preserve his life or save himself from great bodily harm." *McCoy* v. *Commonwealth,* 125 Va. 771, 99 S. E. 644, 646; *Jackson's Case,* 98 Va. 845, 36 S. E. 487; *Vaiden's Case,* 12 Gratt. (53 Va.) 717.

Homicide in such circumstances is excusable. When the difficulty is brought on without fault on the part of the accused, then retreat is not necessary. In such a case, where homicide follows, it is said to be justifiable as distinguished from excusable. *Jackson's Case,* 98 Va. 845, 36 S. E. 487.

 The Commonwealth was entitled to instructions upon its theory of the case, but if it be conceded that the court should have told the jury that this rule did not apply, if it should be of opinion that Ballard was not at fault, the results would remain unchanged. The jury was there correctly told what con-

stituted manslaughter, and then the court proceeded to instruct it as to those things necessary to justify or excuse it. The jury, as is made plain by its verdict, was of the opinion that the crime was murder and not manslaughter, and so error, if any, was harmless.

Objection is made because the court refused "all instructions relating to the relative strength and size of the two principals as bearing upon the question of self-defense or justification."

There are four of them. Instruction "B" was as follows: "The court instructs the jury that evidence that the deceased was a larger and more powerful man than the defendant may show self-defense."

Of course, something more than size is necessary to justify one man in shooting another. The court might well have told the jury that this fact might be considered in determining whether or not the accused did believe, and had reason to believe, that he stood in danger of serious bodily harm. It did, however, elsewhere say: "The accused must show that he had reasonable grounds from his standpoint to believe, and did believe, the danger was imminent, and that the killing was necessary to preserve his own life or to protect him from great bodily harm." And in another instruction it said: "The court instructs the jury that in considering whether the accused acted in self-defense or not you should consider the situation as it reasonably appeared to him at the time." Its failure to further instruct on this point was not reversible error.

Finally, there is an omnibus objection to all else that the court did relative to the defendant's instruction, and this general objection is followed by no specifications beyond the fact that the court is referred to a bill of instructions copied into the record.

"A petition for a writ of error is in the nature of a pleading and should state the *specific* errors claimed to have been committed by the lower court. An assignment of error in general

terms will not answer the requirements of the statute. As said in the *Trigg Case* [106 Va. 327, 56 S. E. 158], *supra,* counsel for the petitioner must 'lay his finger on the error.' " *Thurston* v. *Woodward,* 139 Va. 315, 123 S. E. 366; *Bank* v. *Trigg Co.,* 106 Va. 327, 56 S. E. 158.

We, therefore, shall not undertake to consider omnibus exceptions taken to other instructions. Sufficient it is to say that the jury was adequately instructed, and that the accused has had one fair trial. He can demand no more.

We have found no reversible error in the record, and so for reasons stated the judgment of the trial court must be affirmed, and it is so ordered.

*Affirmed.*