# Staunton

JAMES THACKER v. COMMONWEALTH OF VIRGINIA.

September 17, 1931.

Present, Prentis, C. J., and Campbell, Holt, Hudgins and Gregory, JJ.

The opinion states the case.

*Williams & Combs*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

On December 11, 1929, James Thacker, in the county of Buchanan, shot and killed Lundy Murphy. For this offense he was tried, convicted of murder in the second degree and sentenced to ten years confinement in the penitentiary.

In that county at that time a railroad was in process of construction. This work was being carried on by two construction companies, the Anderson Construction Company and the Nelson Construction Company. Both of them maintained camps for the accommodation of their employees. Their location was near the Kentucky line and in a community rough if not relatively lawless. The defendant who seems to have been for some time engaged in work of like character had been employed to keep order in and about the Anderson camp. He was not an officer, but a private guard. Murphy was then working for the Nelson company. His friend and companion, Ulva Keen, who had worked for it, but who was not then employed, had returned to that camp, seeking, as he claims, reemployment. Murphy, Keen, and some of their friends, were in the Nelson camp Tuesday night preceding the homicide and were engaged in a poker game. There was some drinking and some disorder, but not more than might have been expected from men of their station at that place, engaged in such avocation. But however rude their conduct then was, Thacker knew nothing about it and for that reason could not have been influenced by it. On Wednesday morning

Murphy, Keen and their friend, Williamson, decided to return to Kentucky. Keen asked if there was any law between there and the State line and was told that Thacker was at the Anderson camp and should be avoided "as he was the bird that would get them," to which he answered that he had "six inches of lead" for any man that would interfere with him and that he was going back. After some horseplay they started out. Keen carried a pistol in sight in a holster, but the other two men were unarmed. At first they followed the public road and on it met a man named Wagoner to whom they sold a pint of whiskey. Wagoner advised them to follow the public road and not to go through the Anderson camp since Thacker might arrest them, to which one of them replied that "they didn't fear or give a damn." Williamson, who rode a mule, kept to the public road, while Murphy and Keen went down the railroad track in the direction of the Anderson camp. First they met some engineers working on construction. Someone asked them, "where is Pete?" to which Mr. Harmon, one of these engineers, replied that they did not know. Keen then asked another one of them, Mr. Lund, "how about you, old stud bolt?" To this Lund, who said that he was irritated, answered, "who in the hell wants to know." And Keen answered, "if you don't want a drink, you need not get mad about it." Lund said, "they made the appearance to me of having drunk liquor to the extent of feeling good, but they were able to walk without any staggering." Lund was a witness for the defendant.

Certainly up to this point there was nothing menacing in their actions. At the most all that can be said of them is that they had played poker the night before, had been drinking, and were going home in a good humor. Their road lay in the direction of the Anderson camp and on their way they had sold a pint of whiskey and still had some left.

Thacker has testified and gives us his version of what afterwards occurred. He said:

"First I saw of them they was off the track and come back upon the railroad and they spoke pretty free and the Keen boy in a pretty biggity way, and I saw he had a pistol, the Murphy man came by next to me, I saw he had a jump jacket in his hand and I heard something in there slosh in a fruit jar as he walked and they walked down the road and I turned and looked at them, the Keen boy I never saw him stagger, but the Murphy man I could tell it in his walk and about that time the walking boss came up and got on his horse and rode to the camp and passed them, and I said something to them about drinking, and they said 'to hell with you,' and I didn't intend for them to go in the camp and I went in home and picked up my gun and I said to Joe Ramey there is some fellows drunk and he went with me and I thought I would tell them not to come to the camp but to go away."

He secured for Ramey a pistol and they then went down the railroad track to meet Keen and Murphy.

"Me and Joe was walking up the track and them down, and I stepped off of the track on the outside and I think Joe on the other side and just as I stepped on the side we was right then up together and I put my hand on his arm and I said 'you are drunk and got liquor and I will have to do something with you,' and he said 'to hell with you' and he just kept jobbing at me like that (indicating) with his hands under his overalls bib punching something out towards me and I told him twice to take his hands out, and I kept dodging behind him to get out of range, and he kept turning pointing it towards me, and I saw the end of what it was in his hand, and it was bright and glistened, and I thought it was a pistol."

Whereupon he shot, fatally wounding Murphy. At about the same time, Ramey shot, wounding Keen. Murphy was

not armed and Keen, who was, had taken his pistol from its holster and put it in his pocket where it was when he was shot. Ramey, on cross-examination, tells us what seemed to be in Thacker's mind.

"Q. Have you the slightest idea of what you and Jim was going to do with these boys?

"A. I had an idea when he give me the gun.

"Q. You thought he was going to shoot some people?

"A. I didn't know.

"Q. You knew Jim well?

"A. Yes, sir.

"Q. You knew his reputation along that line?

\* \* \* \* \*

"Q. You and Jim had gone away from your store to shoot these boys?

"A. It is more than 150 yards.

"Q. How long after you got there until you shot?

"A. Pretty quick.

"Q. You shot one and Jim the other?

"A. That is right."

The jury might have believed all that was said on behalf of the defendant and that he had in mind merely a purpose to prevent a drunken bootlegger from coming into the Anderson camp and shot only when it appeared to him that it was immediately necessary to protect himself from a like attack. Manifestly they believed none of this, and they might have believed from Ramey's evidence alone, that Thacker was fatally bent on mischief. Floyd Dales, a witness for Thacker, has testified as to what manner of man he was. He said:

"Q. You told him that Jim was a bird that would get him?

"A. Yes, sir.

"Q. You knew the bird you was talking about?

"A. Yes.

"Q. You knew he was a pistol man?

"A. Yes.

"Q. You knew he would shoot to kill?

"A. I figured he would do it.

"Q. You knew he would kill as soon as he come in contact or would kill one of them?

"A. I figured he would."

For the Commonwealth, Keen stated that Thacker's account of what occurred when he passed the witness on a horse was incorrect; that he said, "how do you do?" and nothing more. He further testified that when Ramey and Thacker met them that they were ordered to "halt" and were shot immediately afterwards and that when shot Murphy "had his right arm up this way, and I believe his left hand in his pocket." On cross-examination he said:

"Q. When they came on up to you and Murphy, didn't they step one to one side and the other to the other side and give you fellows the right of way?

"A. No, sir.

"Q. Did they step right up in front of you?

"A. Yes, sir; in four or five feet.

"Q. What was the first word said?

"A. Halt.

"Q. Who said halt?

"A. I don't remember which one.

"Q. Did you halt?

"A. We didn't have time.

"Q. They went to shooting?

"A. Yes, sir.

"Q. Both of them?

"A. Yes, sir.

"Q. And you fellows didn't have time to halt?

"A. No, sir.

"Q. You got your gun out pretty quick?

"A. No, sir.

"Q. Where was it?

"A. In my right-hand coat pocket.

"Q. How come it in your right-hand coat pocket?

"A. I took it off of the belt and put it in my pocket."

Grayson Williamson, another witness, said:

"Q. What did they do?

"A. They run down to the railroad and walked up the railroad and when they met up with the boys they fired their guns.

"Q. How quick after they come up to the boys?

"A. Fired as quick as they walked up.

"Q. Could you see what the boys were doing?

"A. Murphy had his left hand in his pocket and holding his coat with the other."

Pinson Fields said:

"Q. You saw Thacker come down to the store?

"A. Yes, sir; and they come back by me and got right up to the boys and jerked their guns and shot.

"Q. Who jerked their pistols?

"A. These men here.

"Q. Who jerked their pistol?

"A. Joe Ramey and Thacker.

"Q. How long after they got up until they fired?

"A. Just as soon as they got up to them."

Freeland Lester has testified to the same effect.

After Murphy was shot down and when he still lay where he fell, he said to Thacker: "You have killed me and killed me for nothing," and to that statement Thacker made no reply.

This is Murphy's dying declaration made to Sloan:

"I asked him how the trouble come up—how come Thacker to shoot him and he said he didn't know he was going along down the road carrying his coat on his shoulder and his hand in his overalls and he said he kindly give the road and he said he jobbed his pistol out and shot him."

Some men sometimes perjure themselves, but he is hardy indeed who would go into the presence of Deity with a lie yet hot upon his lips.

The evidence in this case is not only sufficient to sustain this verdict and judgment, but it is amply sufficient. The prisoner has no just grounds for complaint because he was found guilty of murder in the second degree.

No exceptions were taken to the instructions which fully and fairly cover the case.

It is further said that the jury in this case was not drawn from a 1930 list, that there was in fact no such list, but that it was drawn from the 1929 list.

The objection comes too late. Code, section 4895; *Palmer* v. *Commonwealth*, 143 Va. 592, 130 S. E. 398; *Ballard* v. *Commonwealth*, 156 Va. 980, 159 S. E. 222, decided June 18, 1931. This irregularity in no wise damaged the defendant.

If the evidence is sufficient to sustain this verdict it must be sustained. We think it is sufficient. It would be sufficient even were we not fortified by rules which give weight to verdicts and judgments approved by the trial court. They are to be sustained when there is fair conflict in the evidence and for a stronger reason they are to be sustained when the evidence preponderates in their favor. There is no error in this record and the verdict and judgment of conviction must be sustained.

*Affirmed.*