RAYMOND M. HOUGHTALING, JR. V. COMMONWEALTH OF VIRGINIA.

October 14, 1968.

Record No. 6836.

Present, All the Justices.

*Humes J. Franklin, Sr.; Humes J. Franklin, Jr. (J. B. Stombock; Franklin, Poindexter & Franklin, on brief), for plaintiff in error.*

*William P. Bagwell, Jr.; Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

Raymond M. Houghtaling, Jr., the defendant, was convicted by the jury of murder in the first degree of Carol L. Taft, and his punishment was fixed at life imprisonment. To the final order confirming the conviction and imposing the sentence, the defendant was granted a writ of error.

The evidence shows that the defendant and Mrs. Taft had lived together illicitly as man and wife in the city of Waynesboro for several years and that she had not obtained a divorce from her husband, who resided in New York State. The defendant treated Mrs. Taft "like a queen . . . until she wanted to go home and back to her family," and then "she was in danger." He had said "several times" that "he'd never let her go back to her husband, he'd kill her first."

On August 20, 1966, the defendant telephoned Mrs. Taft's mother, Mrs. Helen Johncox, at her home in Waynesboro, and asked her "to collect some money, so that him and Carol could leave the City." Mrs. Johncox "picked up" the defendant's 15-year-old daughter, Patty, and they drove to the appointed place and collected the money.

Mrs. Johncox became alarmed over something Patty told her during the trip, and she called the police "to get protection for Carol."

Mrs. Johncox and Patty met the defendant and Mrs. Taft at the parking lot of B & B Buick, and the police arrived at about the same time. The police officers placed Mrs. Taft in the police cruiser and conversed with her. They then took her to police headquarters; and the defendant, Mrs. Johncox, and Patty followed.

At police headquarters, Mrs. Taft was taken "in a room alone" for a conference, while her mother, the defendant, and Patty waited in the lounge. At the end of the conference, the officers told the defendant that Mrs. Taft "wanted to go back to New York" and that he should let her "go back where she belonged." He "acted like he agreed with them."

The defendant, Mrs. Taft, Mrs. Johncox, Patty, and several police officers then went to the parking lot in front of police headquarters, and the defendant helped remove Mrs. Taft's clothes from his car and place them in Mrs. Johncox's automobile. The defendant asked Mrs. Taft if she had money for bus fare, and when she replied in the negative, he stated that he would go to his shop to "get her some

money." He asked Mrs. Taft to accompany him, but Mrs. Johncox said, "no we will wait here for you to bring the money." The defendant left in his car, and the police officers returned to their building.

Mrs. Taft, Patty, and Mrs. Johncox entered the latter's automobile, with Mrs. Taft sitting on the passenger's side of the front seat, Patty in the middle, and Mrs. Johncox under the steering wheel.

The defendant returned in about 20 minutes, alighted from his car, and walked to the side of the Johncox vehicle where Mrs. Taft was seated. He "dropped" a bank deposit bag in Mrs. Taft's lap and asked her, "are you going to kiss me good-bye?" When she made no reply, he leaned through the window and kissed her. He stepped back and shot her in the head with a revolver, causing her death. He then turned the weapon on himself and fired into his own head, causing the loss of one eye and partial blindness in the other.

The bank deposit bag which the defendant "dropped" in Mrs. Taft's lap was later found to contain no money, "just paper."

■ The defendant alleged insanity as a defense, and he contends that the trial court erred in denying the motion made by his court-appointed counsel to "furnish funds for employment by defendant of an independent expert witness to aid in the determination of his mental condition and the preparation of his defense of temporary insanity." The defendant argues that "unless defense counsel in the case of an indigent accused, who has pleaded insanity, is given the aid of a psychiatrist, there can be no illusion of an 'adequate' opportunity to present the insanity defense or of 'substantial equality' in an adversary procedural system orientated towards a fair trial." The refusal of such assistance, the defendant says, is "a denial of equal protection and due process of law."

We are of opinion that the trial court did not err in denying the defendant's motion. There was no duty upon the Commonwealth to provide the defendant with funds to employ psychiatric assistance.

Following the tragic events of August 20, 1966, the defendant was hospitalized in the Ophthalmology Service of the University of Virginia Hospital for treatment of his self-inflicted wounds. On August 29, he was transferred to the Psychiatric Service because he was "profoundly depressed." Then on September 7, he was committed by the Civil and Police Court for the City of Waynesboro to Southwestern State Hospital at Marion for observation and report, the court having before it the written recommendation of Dr. J. Powell Anderson, the

defendant's own physician, that "further hospitalization in a psychiatric hospital [is] highly desirable if not mandatory." Dr. Anderson's report showed that he had conferred with one of the defendant's attending physicians at the University of Virginia Hospital.

On November 18, 1966, Southwestern State reported to the Civil and Police Court that the defendant was not psychotic or insane, and he was returned for trial.

In the court below, the defendant called as a witness Dr. Bernard H. Kasinoff, a psychiatrist in private practice in Staunton and also Director of the Valley Mental Health Center. The record shows that defense counsel were in communication with Dr. Kasinoff "about ten days" before trial and that they provided him at that time with "a report in letter form" from Southwestern State Hospital. On the day before trial, Dr. Kasinoff reviewed the records of the Psychiatric Service of the University of Virginia Hospital; and on the morning of trial, he reviewed the records of Southwestern State, which included a report that the defendant was "diagnosed with a psychiatric disease . . . in one of the state hospitals in the State of New York" in 1942. Dr. Kasinoff did not examine the defendant personally, but testified at length about his condition, based upon the records he had seen.

Two psychiatrists and a psychologist from Southwestern State Hospital testified in behalf of the Commonwealth upon the issue of the defendant's insanity.

Thus, in addition to Dr. Kasinoff, the psychiatrist secured by the defendant, there were available to the defense, for consultation and advice as to the mental condition of the defendant, the three doctors from Southwstern State; Dr. Anderson, the defendant's own physician; and the doctors at the Psychiatric Service of the University of Virginia Hospital, who had treated the defendant while he was a patient there.

The record does not reveal any motion for a continuance asserting the necessity of additional time for defense counsel to consult with the doctors or to permit further psychiatric examination of the defendant. The record does display an intelligent understanding of the subject of insanity on the part of defense counsel and a thoroughness in preparation for trial.

The precise point in issue, arising under similar circumstances, was before the United States Supreme Court in *United States* v. *Baldi*, 344 U. S. 561, 73 S. Ct. 391, 97 L. ed. 549, 556 (1953). There, the defendant contended that "the assistance of a psychiatrist was neces-

sary to afford him adequate counsel" and that "he should have been given technical pretrial assistance by the State." The court said, "We cannot say that the State has that duty by constitutional mandate." That holding is applicable to and dispositive of the question before us.

■ The defendant next contends that the trial court "erred in commenting to the Jury at the conclusion of the testimony" of a Commonwealth witness. Such comment, the defendant says, lent "credulity to this witness's testimony."

One of the psychiatrists called by the Commonwealth was Dr. Joseph R. Blalock, Superintendent of Southwestern State Hospital. At the conclusion of Dr. Blalock's testimony, the trial judge remarked:

"I was a member of the State Hospital Board for about ten or twelve years, some years ago. It was a very interesting service. This *fella* was superintendent. It's a tough job running one of those institutions."

There was no objection made to the trial judge's statement, and no point was raised with respect thereto until a motion for a new trial was filed more than two months after the jury's verdict was returned. Objection should have been interposed at the time the statement was made, so as to give the judge an opportunity to remedy the situation. Even so, we do not consider the making of the comment of sufficient importance to warrant a reversal. To say merely that a "fella" has a "tough job" is not to affirm his credibility. Thus, any error involved in the incident was harmless.

■ The defendant next contends that the trial court erred in refusing to grant his Instruction B as offered.

Instruction B was originally worded as follows:

"The Court instructs the jury that in this case no burden whatsoever rests on the accused to establish his innocence, on the contrary, the whole burden of proof, which never shifts, rests on the Commonwealth throughout the entire case, to prove to the jury by definite, unequivocal, clear and convincing legal evidence, beyond every reasonable doubt, that he is guilty as charged. Nothing is to be presumed or taken by implication against him. No suspicion of guilt, however strong, is ever sufficient to convict. No mere preponderance of the evidence will suffice as in the trial of a civil case. It is not sufficient that the jury may believe his guilt probable, or

that he is more probably guilty than innocent, for in law no degree of mere probable guilt, however grave or strong, will authorize a conviction; nor can he be convicted upon proof of facts consistent with guilt, unless such facts are also inconsistent with his innocence and actually exclude every reasonable hypothesis or theory which is consistent with his innocence.

"If, therefore, the evidence disclosed any reasonable hypothesis or theory of innocence, or if for any reason, the evidence or lack of evidence fails to produce upon the minds of the jury a certainty of his guilt, beyond a reasonable doubt, it is your duty to find him not guilty."

The trial court granted the instruction with the first paragraph unchanged, but amended the last paragraph to read as follows:

"If, therefore, the evidence disclosed any reasonable hypothesis or theory of innocence, or if for any reason, the evidence or lack of evidence fails to produce upon the minds of the jury a reasonable doubt of his guilt, it is your duty to find him not guilty."

The defendant says that the instruction as finally granted improperly placed upon him the burden of proving his innocence.

We do not agree. It is obvious that to have any meaning, the changed language of the last paragraph of the instruction should not have included the words "fails to" and should have employed the word "produces" rather than "produce." As it was finally worded, the amended clause of the paragraph was without legal meaning and thus could not have misled the jury, especially in light of the over-emphatic language of the first paragraph and of the concluding admonition, "it is your duty to find him not guilty."

The court granted, at the request of the defendant, nine instructions in all, dealing, among other things, with the presumption of innocence, burden of proof, and reasonable doubt. In some instances, the instructions are couched in language far more favorable to the defendant than was proper. In those instructions, the words "doubt," "doubtful," or "reasonable doubt" appear seventeen times; the words "burden" or "burden of proof," four times; and the words "certainty" or "moral certainty," three times. From a reading of the instructions, it is inconceivable that the jury could have misunderstood where the burden of proof rested or that they were misled in reaching the one proper verdict possible under the evidence.

The defendant's next contention is that the trial court erred

"in failing to provide for the recording *verbatim* of the evidence and the incidents of trial as required by Section 17-30.1 of Va. Code Ann. (Repl. Vol. 1960), in that neither the closing arguments of the Commonwealth's attorney, or the defendant were recorded."

Code, § 17-30.1, upon which the defendant relies, provides that "In all felony cases, the court or judge trying the case shall by order entered of record provide for the recording verbatim of the evidence and incidents of trial either by a court reporter or by mechanical or electronic devices approved by the court."

The trial court, by order entered of record, directed "that all evidence and incidents of trial in this matter be recorded verbatim by Gray Audograph electric recording machine." The evidence was recorded, but for some reason the closing arguments were not.

However, the trial judge, after the case had gone to the jury, dictated into the record a narrative statement of the portion of the closing argument of the Commonwealth's Attorney to which the defendant had objected. The transcript containing the narrative statement was signed by the trial judge, attesting its authenticity. Rule 5:1, § 3 (f), Rules of Court.

The use of a narrative statement is recognized by our Rules as a proper method of furnishing a record of evidence and incidents of trial for appeal. Rules 5:1, § 3 (e) and (f). The statement dictated into the record by the trial judge in this case is amply sufficient to permit us to dispose of the objection to the argument of the Commonwealth's Attorney, and so the defendant was not prejudiced by the failure to record that portion of the trial.

This leads us to the defendant's final contention: that the argument of the Commonwealth's Attorney was improper.

During closing argument, the Commonwealth's Attorney exhibited the murder weapon to the jury and stated that the defendant had left the police parking lot where Mrs. Taft was seated in her mother's car and that when he returned, he had the gun with which he killed his victim.

The defendant objected to the argument on the ground that "the evidence did not show where he [the defendant] got the pistol from, whether he had it before he left or not."

The trial court, when later considering the defendant's motion for a new trial, said of the closing argument of the Commonwealth's Attorney:

"... I think the facts were such ... that he [the Commonwealth's

Attorney] had a right to interpret them as he did. As a matter of fact in the course of the trial, that's exactly what I thought the man did, based on the evidence. . . ."

We agree with the trial court. The evidence concerning the actions and conduct of the defendant permitted the inference that he had secured the pistol while on the ostensible errand to secure money and that he returned with the weapon to wound or kill Mrs. Taft. That inference was reasonable and plausible under the evidence, and the argument of the Commonwealth's Attorney with respect thereto was not improper.

We find no error requiring reversal of the conviction of the defendant. The judgment of the trial court will, accordingly, be affirmed.

*Affirmed.*