## Richmond

### VINCENT LAMONT MARTIN

### v.

### COMMONWEALTH OF VIRGINIA

October 10, 1980.

Record No. 800519.

Present: All the Justices.

Robert N. Johnson; Robert H. Herring, Jr., for appellant.
Richard B. Smith, Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

CARRICO, J., delivered the opinion of the Court.

In the first stage of a bifurcated proceeding conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted the defendant, Vincent Lamont Martin, of capital murder[1] in the willful, deliberate, and premeditated killing of a law enforcement officer for the purpose of interfering with the performance of the officer's official duties. Code § 18.2-31(f). Then, in the second stage, the jury fixed the defendant's punishment at death. At a subsequent sentencing hearing, the trial court imposed the death sentence. Code § 19.2-264.5. The defendant is here for automatic review of his death sentence, consolidated with his appeal from his conviction. Code § 17-110.1(A) and -110.1(F).

In the view we take of the case, it is unnecessary to set out the evidence in detail. A brief summary of the case made by the Commonwealth's evidence will suffice.

In the early morning hours of November 13, 1979, Michael Patrick Connors (sometimes referred to in the record as Michael Patrick Conners) was on duty as a patrolman with the Richmond Police Department. He was a member of the uniform division and, on the night in question, was assigned to patrol a designated area in a marked police car.

During Connors' shift, the defendant participated with others in the robbery of a convenience store on West Grace Street in Richmond. The robbers made their getaway in a waiting car.

Before the police broadcast a report of the robbery, Officer Connors stopped the getaway car, apparently for a traffic violation, several blocks from the robbery scene. Connors alighted from his cruiser and was met by the defendant at the rear of the stopped car. When the defendant asked the officer what he wanted, Connors ordered the defendant to return to his car. The defendant fired six or seven shots at Connors. The defendant then fled in the car with his companions.

---

[1] In the same trial, the defendant was convicted also of robbery and of two counts of using a firearm in the commission of a felony. These convictions, however, are not before the court in, and are not pertinent to, this appeal.

Connors was left mortally wounded with five shots in the head, face, and neck. His service revolver remained strapped in its holster.

Before the trial below, the defendant moved to dismiss his capital murder indictment on the ground that the death penalty statutes applicable to his case are unconstitutional. After argument, the trial court denied the motion. On appeal, this denial is the subject of a principal assignment of error upon which the defendant bases a contention that he should not have been prosecuted for, or convicted of, capital murder. We begin with a consideration of this assignment.

■ The defendant advances several arguments against the death penalty statutes. First, he says that death by electrocution[2] causes "the needless imposition of pain before death and acute mental and emotional suffering while awaiting execution of sentence." Therefore, the defendant maintains, "execution by electrocution constitutes cruel and unusual punishment in contravention of the Eighth Amendment to the Constitution."

The United States Supreme Court, however, has held that death by electrocution is not a constitutionally impermissible mode of punishment. *In Re Kemmler,* 136 U.S. 436, 447-48 (1890). This court has followed *Kemmler* and adopted the same view. *Hart* v. *Commonwealth,* 131 Va. 726, 743, 109 S.E. 582, 587 (1921).

■ Second, the defendant contends that Code § 19.2-264.2 is unconstitutionally vague in permitting imposition of the death penalty for future criminal acts which, according to the defendant, "might not in themselves be severe." Here, the defendant refers to that portion of Code § 19.2-264.2 which permits imposition of the death penalty for a capital offense where, after consideration of the past criminal record of the accused, the court or jury finds there is "a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society."[3] The defendant argues this statutory language permits imposition of the death penalty on the basis of "anticipated crimes which would not constitute an offense against the person or, if so, would not be of the magnitude to warrant consideration in returning the sentence of death."

The ready answer to this attack upon Code § 19.2-264.2 is that the challenge already has been asserted and rejected. In *Smith* v.

---

[2] Code § 53-318 provides that a death sentence shall be carried out by electrocution.

[3] The evidence at the punishment stage of the defendant's trial showed that he had been convicted for possessing a sawed-off shotgun in the perpetration of a robbery occurring November 13, 1972, and for a robbery occurring December 1, 1972. He was sentenced to the penitentiary for these convictions. He had been free on parole three months when the present offense occurred.

*Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979), we noted that the language in Code § 19.2-264.2 concerning probable future acts of violence was identical with the wording of the Texas statute upheld in *Jurek* v. *Texas,* 428 U.S. 262 (1976). We said in *Smith* and reiterate here: "We see no constitutional vagueness in that language." 219 Va. at 477, 248 S.E.2d at 148.

■ Third, the defendant asserts that Code § 18.2-31(f), specifically relating to the killing of a law enforcement officer, is unconstitutionally vague in permitting imposition of the death penalty where the killing, in the words of the statute, is "for the purpose of interfering with the performance of [the officer's] official duties." The defendant argues that the quoted language is so vague "as to render an indictment under this section void." The statute is deficient, the defendant asserts, because it permits imposition of the death penalty without proof that the officer "was acting in the lawful discharge of an official duty." To illustrate the defect, the defendant suggests that, under the statute, "any time an individual, who happens to be a police officer, on or off duty is killed, that killing necessarily will interfere with the performance of the decedent's official duties."[4]

We do not believe that Code § 18.2-31(f) suffers unconstitutional vagueness. The section does not permit imposition of the death penalty just because a murder victim happens to be a law enforcement officer. By its clear terms, the section makes purpose a key factor in any prosecution thereunder; the death penalty may be imposed only where the Commonwealth proves beyond a reasonable doubt that the killing of a law enforcement officer is accompanied by the purpose of interfering with the performance of his official duties.

In the present case, the trial court correctly interpreted and applied Code § 18.2-31(f) by imposing upon the Commonwealth the affirmative burden of proving the existence of the purpose stated in the statute.[5] For this reason, we reject an additional argument advanced

---

[4] Corollary to this argument, the defendant contends that, because Officer Connors was outside his designated area of patrol at the time he was killed, the officer could not have been performing his duties lawfully. Thus, the defendant concludes, he is not subject to the death penalty for Connors' killing. We reject this contention.

[5] In pertinent part, Instruction 12, granted by the trial court, reads:

The defendant is charged with the crime of capital murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

\* \* \*

(4) That the killing [of Officer Connors] was for the purpose of interfering with the performance of his official duties.

against Code § 18.2-31(f), *viz.,* that, in violation of the rule enunciated in *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), this section creates a conclusive presumption in favor of the Commonwealth and shifts to the defense the burden of proving the nonexistence of the stated purpose. We hold that the trial court did not err in refusing to dismiss the capital murder indictment.

This brings us to consideration of an assignment of error challenging the refusal of the trial court to exclude a prospective juror, Gloria W. Cromwell, for cause. In response to a series of questions propounded on voir dire by the trial judge and the prosecutor, Mrs. Cromwell indicated that she had never before served on a jury, that she was not "sensible" of any bias or prejudice against the defendant, that she knew of no reason "whatsoever" why she could not give the defendant a fair trial, that she would "try" to judge the testimony impartially, and that she would listen to all the testimony and base her decision "solely on the evidence and the law given to [her] by the Court." Then, upon further examination, the following occurred:

BY MR. HERRING [defense counsel]:   (Continuing)
Q.   Mrs. Cromwell, if the Court tells you, as I believe the Court has told you, that the burden is on the Commonwealth to prove each and every element of the offenses and that Mr. Martin does not have to put on any evidence, would you be able to follow that instruction?
A.   Yes.
Q.   Do you feel at the present time, right now, that Mr. Martin has to prove that he is innocent?
A.   Yes, I feel he has to prove, you know—
Q.   That Mr. Martin has to prove that he is innocent?
A.   Yes.
THE COURT:   Did you hear the Court say to you earlier that the burden is on the Commonwealth to prove the case beyond a reasonable doubt and that there is no burden on the defendant to put on any evidence at all if he doesn't wish to and he is presumed innocent until the Commonwealth proves his guilt beyond a reasonable doubt? Do you understand that? That is the law. Would you be willing to follow that law? The defendant doesn't have to prove anything. Are you willing to follow that law if the Court gives it to you?
MRS. CROMWELL:   Yes.
THE COURT:   Under those circumstances, of course, you have got to agree that the defendant doesn't have to prove anything.

He doesn't even have to put on any evidence if he does not wish to. Do you understand that?

MRS. CROMWELL: (Shaking head affirmatively)

THE COURT: Knowing what I have just told you, do you still think the defendant has to prove his innocence?

MRS. CROMWELL: Yes, I think he has to prove, you know, to make sure that he did it or not.

THE COURT: But, I'm telling you the Commonwealth has to prove that he did it. He doesn't have to prove he didn't do it. Do you understand that?

MRS. CROMWELL: Yes.

THE COURT: Could you abide by the instructions of the Court which tell you that?

MRS. CROMWELL: Yes.

THE COURT: All right.

MR. HERRING: Just to make sure I have the correct response, Your Honor—

BY MR. HERRING: (Continuing)

Q. Mrs. Cromwell, I'm sorry, but I want to ask you again. I want to make certain that I understand it. Do you feel that Vincent Martin has to prove that he did not commit these crimes?

A. Repeat that again.

Q. Do you feel that Vincent Martin has to prove that he did not commit these crimes?

A. Yes.

THE COURT: Well, now, you're telling counsel one thing and you're telling me another.

MRS. CROMWELL: Oh, no, no.

\*   \*   \*

THE COURT: And I have told you that the Court will instruct you in the law that the Commonwealth has the burden of proving the case beyond a reasonable doubt, every material element of the case beyond a reasonable doubt, and that the defendant doesn't have to prove anything. Now, under those circumstances, do you still feel that he would have to prove his innocence when I tell you that the Court is going to tell you the law is otherwise?

MRS. CROMWELL: (No response)

THE COURT: Can you accept the instruction of the Court that he doesn't have to prove anything?

MRS. CROMWELL: Yes.

THE COURT: Do you want to ask any more questions? I'm not sure she understands.

\* \* \*

BY MR. JOHNSON [defense counsel]:

Q. Ma'am, understand what we are saying. Be completely honest with us, because nobody is after you or fussing at you. We are just trying to decide whether or not you should sit on the case. Do you understand what all of us have been saying to you in the last few minutes?

A. Yes.

Q. What have we been saying to you?

A. To, you know, prove guilty or not.

Q. Who?

A. The defendant.

Q. Who has to do the proving?

A. We do, the ones who will be—gosh.

Q. Do you think the burden is upon the jury to—

A. Yes.

Q. —prove he is guilty?

A. Yes.

Q. Do you feel that because Vincent has been charged with a crime—excuse me. Do you have any present opinion as to whether he is guilty or innocent right now?

A. No, I don't.

Q. What is your opinion as to his guilt or innocence right now?

A. Innocent.

\* \* \*

THE COURT: Well, that's correct. That's what the Court has told you. He is presumed innocent throughout the entire trial until the Commonwealth proves him guilty beyond a reasonable doubt. What we are trying to find out is whether, if you are instructed that way, you can abide by the instructions of the Court and not feel he has got to prove anything. Can you?

MRS. CROMWELL: Yes, sir.

\* \* \*

BY MR. JOHNSON: (Continuing)

Q. Ma'am, if Vincent Martin didn't take the stand, didn't say anything at all, would you hold it against him?

A. No, I wouldn't.

Following this exchange, defense counsel voiced objection to the selection of Mrs. Cromwell as a member of the panel of twenty veniremen. The trial court overruled the objection and placed Mrs. Cromwell on the panel. Exercising a peremptory challenge, the defense excluded her from the jury.

█ The defendant argues that the trial court should have excluded Mrs. Cromwell for cause in view of her answers on voir dire that indicated she did not stand indifferent in the matter on trial. The Attorney General argues that, while Mrs. Cromwell may have been "initially confused by the legal technicalities involved in the case," her confusion was not enough, per se, to exclude her for cause. In addition, the Attorney General asserts, Mrs. Cromwell was "completely rehabilitated by the questions on the point of whether the defendant had to prove his innocence." Thus, the Attorney General concludes, Mrs. Cromwell not only stood indifferent in the case but also demonstrated an ability to give the defendant the benefit of doubt.

In *Breeden* v. *Commonwealth,* 217 Va. 297, 227 S.E.2d 734 (1976), Mary Alice Plummer, a prospective juror in a murder case, was asked by defense counsel on voir dire whether the defense had to prove the accused was innocent. Mrs. Plummer replied affirmatively. After the trial judge and the prosecutor received favorable replies to their rehabilitative questions, Mrs. Plummer was placed on the panel of twenty veniremen. The defense used a peremptory challenge to exclude her.

Reversing Breeden's conviction for the error in selecting Mrs. Plummer, we observed that an accused is entitled to an impartial jury as a matter of constitutional guarantee,[6] reenforced by legislative mandate[7] and by the Rules of this court.[8] Veniremen, we said, "must 'stand indifferent in the cause.' " 217 Va. at 298, 227 S.E.2d at 735.

Further in *Breeden,* with respect to the "crucial question" whether the accused had to prove his innocence, we noted that Mrs. Plummer's affirmative response "was not so much a symptom of her ignorance of the law as a candid reflection of the state of her mind concerning Breeden's guilt." Continuing, we said that the efforts of the trial judge and the prosecutor to rehabilitate Mrs. Plummer did not "assuage our concern"; she merely gave expected answers to leading questions. Proof that a prospective juror is impartial and fair, we stated, " 'should come from him and not be based on his mere assent to persuasive suggestions.' " 217 Va. at 300, 227 S.E.2d at 736.

---

[6] U. S. Const. amends. VI and XIV; Va. Const. art. I, § 8.

[7] Va. Code § 8.01-208.28 (now § 8.01-358).

[8] Rule 3A:20(b).

Concluding in *Breeden,* we said that the error in selecting Mrs. Plummer was not rendered harmless because the accused had excluded her by peremptory challenge. It was prejudicial error, we held, for the trial court to force the accused to use a peremptory challenge "to exclude a venireman who [was] not free from exception." *Id.,* 227 S.E.2d at 737.

The present case is indistinguishable from *Breeden.* Indeed, to an even greater extent than was true of the prospective juror there, Mrs. Cromwell displayed here an attitude so repugnant to a sense of fairness and so indicative of an ingrained and tenacious bias against one accused of crime that "no amount of rehabilitation" could purge the taint and qualify her as a juror "who would stand impartial and free from prejudice." *Justus* v. *Commonwealth,* 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980). And, as was true of the prospective juror in *Breeden,* Mrs. Cromwell's attitude here "was not so much a symptom of her ignorance of the law as a candid reflection of the state of her mind concerning [the defendant's] guilt." 217 Va. at 300, 227 S.E.2d at 736.

■ The constitutional and statutory guarantee of an impartial jury is no mere "legal technicality," but a substantive right scrupulously to be observed in the day-to-day administration of justice. Generally, whether a prospective juror should be excluded for cause is a matter within the sound discretion of the trial court, and its action in refusing to exclude a particular venireman is entitled to great weight on appeal. *Waye* v. *Commonwealth,* 219 Va. 683, 690, 251 S.E.2d 202, 206, *cert. denied,* 442 U.S. 924 (1979); *McCue* v. *Commonwealth,* 103 Va. 870, 993, 49 S.E. 623, 626 (1905). But the refusal to exclude for cause a venireman who believes an accused must prove his innocence is an abuse of discretion and a denial of a defendant's right to an impartial jury. The denial of this right in the present case constitutes prejudicial error, requiring that the case be retried.

This result makes it unnecessary or inappropriate for this court to consider a number of the other questions raised by the defendant's appeal. Several issues remain, however, that are likely to arise upon retrial and are appropriate subjects for appellate comment.

■ The first of these issues stems from the trial court's denial of the defendant's pretrial motion for the appointment of an investigator "to assist court appointed counsel and the defendant in the preparation of defenses." The defendant argues that, in view of his indigence, the nature of the offense with which he was charged, and the number of investigators available to the Commonwealth, it was a denial of due

process of law for the trial court to refuse to appoint an investigator to assist him.

The defendant cites no authority for the proposition that an indigent accused has a constitutional right to the appointment at public expense of an investigator to assist in his defense. It has been held, however, that it is not a denial of due process to refuse an indigent accused the services of a court-appointed psychiatrist. *Smith* v. *Baldi,* 344 U.S. 561, 568 (1953); *Houghtaling* v. *Commonwealth,* 209 Va. 309, 311-13, 163 S.E.2d 560, 561-62 (1968), *cert. denied,* 394 U.S. 1021 (1969). From a constitutional standpoint, we perceive no difference between the denial of an indigent defendant's request for a court-appointed psychiatrist and the refusal of a plea for a publicly paid investigator. We hold, therefore, that the trial court did not err in denying the defendant's motion.

Second, again making a due-process argument, the defendant contends that the trial court erred in denying his request for a daily transcript of the proceedings below. In rejecting this contention, we borrow the conclusion of the Eighth Circuit Court of Appeals with respect to a similar request in *Walle* v. *Sigler,* 456 F.2d 1153, 1156 (1972):

> Nothing in any of the Supreme Court cases that have come to our attention even remotely suggests the novel idea [that an indigent defendant has] the right to a daily transcript. We decline to adopt such an idea here.

The third issue involves another incident occurring during the voir dire examination of prospective jurors. The trial judge asked this question:

> Now, if co-defendants—and they are people who are charged with the same crime as the defendant—were to testify against the defendant in this case, would you be able to judge their testimony impartially and not reject their testimony simply because of the fact that they are co-defendants?

After several prospective jurors had been asked the question in this form, defense counsel objected. The stated ground was that the question improperly indicated that testimony of accomplices, whether corroborated or not, should be given the same weight as that of any other witness. The trial court then agreed to alter the question so that it would read:

Now, if co-defendants, that is, people who have been charged with the same crime as the defendant, were to testify against the defendant, would you automatically reject their testimony simply because they are co-defendants?

Even in this altered form, the defendant objected to the question because it used the term "co-defendants" rather than "accomplices." On brief, the defendant concedes that the terms "co-defendants" and "accomplices" are indistinguishable, as applied to this case. He still argues, however, that the trial court erred in failing to change "co-defendants" to "accomplices" in later questioning of prospective jurors. We find this argument meritless.

■ Fourth, the defendant complains concerning the admission into evidence of several photographs depicting the murder scene, the police automobile driven by Officer Connors, bullet fragments found at the scene, and the victim's body. The defendant argues that the photographs injected into the trial improper and irrelevant considerations and so inflamed and aroused the jury that he was denied due process of law.

We have said many times that the admission of photographs into evidence rests within the sound discretion of the trial court. We will not reverse the court's action unless a clear abuse of discretion is shown. *E.g., Waye* v. *Commonwealth, supra,* 219 Va. at 692, 251 S.E.2d at 208; *Smith* v. *Commonwealth, supra,* 219 Va. at 467-68, 248 S.E.2d at 143. We find no abuse of discretion in the present case.

■ Fifth, the defendant contends that the trial court erred in granting Instruction 17, which told the jury that the Commonwealth did not have to prove a motive for the killing of Officer Connors, and in refusing Instruction A, which would have told the jury that the Commonwealth did have to prove a motive to sustain the charge of capital murder. The defendant argues that, under the "purpose of interfering" language of Code § 18.2-31(f), the terms "purpose" and "motive" are synonymous and that the Commonwealth, therefore, must prove motive to sustain a charge of capital murder.

We agree with the Attorney General that the "purpose of interfering" language of Code § 18.2-31(f) does not change the established rule of law that motive is not an essential element of murder, although proof of motive may tend to establish intent in cases of circumstantial evidence. We believe further that the word "purpose" in Code § 18.2-31(f) equates with intent, rather than motive. As previously indicated, Instruction 12, note 5 *supra,* placed upon the Commonwealth the burden of proving that the killing of Officer Connors was accom-

panied by the purpose of interfering with the performance of his official duties. We find no error, therefore, in the trial court's action with respect to Instructions 17 and A.

For the error in failing to exclude Mrs. Cromwell from the jury for cause, the defendant's sentence of death will be vacated, the judgment of conviction will be reversed, and the case will be remanded for a new trial.

*Reversed and remanded.*

COMPTON, J., dissenting in part.

In the course of deciding that the trial court committed reversible error by failing to exclude Juror Cromwell, the majority has not given proper attention to the following elementary principles of appellate review. Whether a prospective juror should be excluded for cause is a matter within the sound discretion of the trial court. *Waye* v. *Commonwealth,* 219 Va. 683, 690, 251 S.E.2d 202, 206, *cert. denied,* 442 U.S. 924 (1979). An appellate court must attach great weight to the opinion of the trial judge when the competency of a juror is in issue. *McCue* v. *Commonwealth,* 103 Va. 870, 993, 49 S.E. 623, 626 (1905). The foundation for the foregoing principles is obvious. The trial judge observes and hears the veniremen in the midst of the trial atmosphere while we, as a reviewing tribunal remote from the trial courtroom, are called upon to divine a prospective juror's "state of mind" and thereby conclude she has an "ingrained and tenacious bias" against the accused, based on nothing more than a cold record consisting of words on the printed page. The trial judge is in a better position than anyone else to gauge the venireman's "state of mind," "attitude," candor, and purpose to give fair judgment on the evidence. *Ballard* v. *Commonwealth,* 156 Va. 980, 1000, 159 S.E. 222, 229 (1931). Guided by these precepts, I am of opinion there was no abuse of discretion in seating Juror Cromwell.

The prospective juror stated that she was not sensible of any bias or prejudice against the accused, that she knew of no reason "whatsoever" why she could not give defendant a fair trial "according to the law and the evidence," that she had never before served on a jury in a civil or criminal case, that she would "try" to judge the testimony impartially, and that she would listen to all the testimony and base her decision "solely on the evidence and the law given to [her] by the Court." While Cromwell was obviously not as well-versed as the law graduate in the legal niceties dealing with burdens of proof, I submit

the trial court did not err in concluding she met the basic test and stood "indifferent to the cause." Code § 8.01-358. As I view the entire voir dire examination of Cromwell, the trial judge could properly conclude that she had no preconceived inclination against defendant and that she had not formed any *substantial* opinion as to defendant's guilt or innocence. Her responses to cross-examination by counsel merely indicate, I submit, complete ignorance of applicable rules of law, a circumstance which alone does not render a juror incompetent. *See Justus* v. *Commonwealth,* 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980).

Building on *Breeden* v. *Commonwealth,* 217 Va. 297, 227 S.E.2d 734 (1976), which went to the outer limit in circumscribing the function of the trial judge in this area, the majority today accelerates a trend, which I resist, of requiring disqualification of jurors when they articulate insubstantial "attitudes" and views acquired through ignorance of the law. Certainly, if upon inquiry into the underpinning and depth of a venireman's expressed sentiment, the view of the prospective juror is substantial as to the guilt or innocence of the accused, that person should be excluded. But if, as here, the inquiry demonstrates the person's conclusion is merely unsubstantial and is the result of unenlightenment, the venireman should be seated. *See Robinson* v. *Commonwealth,* 104 Va. 888, 892, 52 S.E. 690, 691 (1906).

For these reasons, I would affirm this conviction.