WAYNE KENNETH DELONG

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 870182 and 870203

November 25, 1987

Present: All the Justices

Cary B. Bowen (Robert P. Geary, on brief), for appellant.

Donald R. Curry, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Leah A. Darron, Assistant Attorney General, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

A jury convicted Wayne Kenneth Delong of capital murder for "[t]he willful, deliberate and premeditated killing of a law-enforcement officer . . . when such killing is for the purpose of interfering with the performance of his official duties", Code § 18.2-31(f), and of the use of a firearm in the commission of murder, Code § 18.2-53.1. On the firearm conviction, the jury fixed the penalty at imprisonment for four years. In a separate proceeding, *see* Code § 19.2-264.3(C) and -264.4(A), the jury fixed the penalty on the homicide conviction at death. The trial court considered the probation report as required by Code § 19.2-264.5 and entered final judgments confirming the two convictions and imposing the penalties fixed by the jury.

By order entered March 4, 1987, we certified an appeal of the firearm conviction to this Court, *see* Code § 17-116.06(B)(1), and consolidated that appeal with Delong's appeal of the capital murder conviction. We have consolidated the appeals of these convictions with the automatic review of the death penalty mandated by Code § 17-110.1(A) and (F) and accorded the consolidated proceedings priority on our docket as required by Code § 17-110.2.

While we will notice all the issues discussed on brief and in oral argument, we will adjudicate only those raised at trial in compliance with Rule 5:25, our contemporaneous objection rule, *Payne* v. *Commonwealth*, 233 Va. 460, 464, 357 S.E.2d 500, 503 (1987); *Townes* v. *Commonwealth*, 234 Va. 307, 319, 362 S.E.2d 650, 656 (1987) (this day decided), and those raised on appeal by assignment of error, Rule 5:17(c). The constitutional challenges the defendant makes to the capital murder statutes have been considered and rejected in the several decisions assembled in *Pope* v. *Commonwealth*, 234 Va. 114, 122, 360 S.E.2d 352, 357 (1987), and we will reaffirm those decisions.

## JURY SELECTION

Addressing both the guilt and penalty phases of his trial, Delong argues that he was denied an impartial jury because the trial court dismissed eight prospective jurors who stated that they were unalterably opposed to imposition of the death penalty. This argument was first rejected in *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), and more recently in *Lockhart* v. *McCree*, 476 U.S. 162 (1986). We have applied *Witherspoon* and *Lockhart* in *Gray* v. *Commonwealth*, 233 Va. 313, 334-35, 356 S.E.2d 157, 168-69 (1987); *Pruett* v. *Commonwealth*, 232 Va. 266, 277-78, 351

S.E.2d 1, 8 (1986), *cert. denied*, 482 U.S. ____, 107 S.Ct. 3220 (1987); and *Frye* v. *Commonwealth*, 231 Va. 370, 385, 345 S.E.2d 267, 278 (1986). *See Townes*, 234 Va. at 327, 362 S.E.2d at 661; *Boggs* v. *Commonwealth*, 229 Va. 501, 514-15, 331 S.E.2d 407, 417-18 (1985), *cert. denied*, 475 U.S. 1031 (1986); *Poyner* v. *Commonwealth*, 229 Va. 401, 413-14, 329 S.E.2d 815, 825, *cert. denied*, 474 U.S. 865 (1985); *Waye* v. *Commonwealth*, 219 Va. 683, 690-91, 251 S.E.2d 202, 207, *cert. denied*, 442 U.S. 924 (1979). We find no error in the selection of the jury.

## THE FACTS

Delong assigns error to certain evidentiary rulings and to the sufficiency of the evidence. The transcript reveals no material conflict in the facts. Delong and Gerald William Bradley, Jr., a convicted felon, visited a number of bars in the Richmond area on June 14, 1986. Delong was driving a car owned by his girlfriend which Bradley described as "a Pontiac . . . a Grand Prix or Monte Carlo". Bradley observed a handgun lying on the floor under the driver's seat near the console. The next day, Delong and Bradley joined Charles Lee Bowers, another felon, at the Ritz, a "beer joint" in Richmond. The three men spent the afternoon drinking beer and left together in the car Delong was driving.

George Ronald Taylor, a veteran Richmond detective assigned to the burglary detail and traffic control, had reported for work earlier that afternoon. About 5:30 p.m., Taylor, driving an unmarked police car with red and blue flashers mounted inside the grille, was following the car Delong was driving along Kensington Avenue. Bowers, sitting in the front passenger seat, heard Delong say, "A mother-fucking cop is pulling me over." Delong drove another city block, turned onto Davis Avenue, and stopped. Bradley, sitting on the back seat, heard Delong say, "I am going to have to shoot this nigger." Bowers heard the same comment and assumed that "maybe the man was going to give [Delong] a ticket for speeding."

At 5:30 p.m. on June 15, 1986, Dorothy Smith parked her car at her home located near the intersection of Kensington and Davis Avenues. Her attention was attracted to an unmarked police car following what she later described to an officer as "a beige colored Pontiac . . . [with] a brown painted color top." The Pontiac turned onto Davis Avenue and stopped, and the police car stopped behind it. Smith testified that detective Taylor got out of his car

carrying a small radio. As she was leaving her own car, she heard Taylor say, "I really hate to do this to you, man." Smith saw Delong "watching every move that the officer made in his rearview mirror". Taylor was not displaying a weapon, and he did not use the radio. Approaching the rear of the Pontiac, Taylor "was just casually walking in that direction". At that point, Smith saw that Delong "had a gun in his hand . . . near his shoulder." When Taylor reached the driver's window, Delong fired the gun into the officer's chest. Another witness on the scene used the radio in Taylor's car to call for help, and an ambulance responded and carried Taylor to a hospital. The bullet, described as a .45 caliber, hollow point, designed to "mushroom" upon impact, had perforated the esophagus and the right atrium of the heart, and doctors' efforts to save their patient were unsuccessful.

Bradley did not see Delong fire the fatal shot, but he became alarmed when Delong fired a second shot into the floorboard of the car. Bradley testified that he "jumped up in the two bucket seats and . . . grabbed [the gun]" and that Delong said, "I just shot that mother-fucker, and . . . shut up, or I will shoot your ass". As Bowers remembers the comment, Delong had said "I just killed a goddamn cop. Shut up or the same thing will happen to you."

At a hearing on Delong's pre-trial motions to suppress, the trial court heard evidence concerning the identification and apprehension of the accused and the seizure of the murder weapon. Michael Batten, a Henrico County police officer, testified that, at 5:43 p.m. on June 15, he and his supervisor, Sergeant William Wilson, heard "an all cars communication" reporting the shooting of Detective Taylor. The report described the car as "a yellow Grand Prix with a rust-colored top" occupied by three white males, one of whom wore a beard. Five or ten minutes later, Batten saw such a car east of Richmond, travelling east on Interstate Route 64. At the officer's signal, the car stopped on the shoulder, and Batten parked behind it. As Batten approached the passenger side of the vehicle, Wilson walked to the rear of the police car and aimed a shotgun at the suspect.

Delong, the only occupant of the Grand Prix, matched the description of the bearded man given the officers, and Batten said that Delong "was in a very heavy sweat." Delong told Batten that his driver's license "was with a person in Virginia Beach", but he gave Batten his name, age, and social security number. The Divi-

sion of Motor Vehicles reported by radio that Delong's license had been suspended or revoked, and Batten required Delong to get out of the car and stand with him and Wilson on the passenger side of the police car.

Responding to Batten's radio report, several Richmond police officers arrived on the scene. Richmond Detective R. T. Fleming testified that he recognized the Grand Prix and the driver from the descriptions given by witnesses at the scene of the killing. He had also learned that the murder weapon "was a handgun and also a large caliber." When Fleming approached the Grand Prix, all its windows were rolled down and the doors were unlocked. Standing outside the car, Fleming "looked to see what I could see inside the vehicle" and "under the driver's seat . . . I could see a handgun."

Fleming reported what he had seen to Henrico officer Batten. Batten, standing "[r]ight outside the driver's door", looked through the window, saw below the driver's seat the handle of a handgun protruding from a holster, opened the driver's door, and seized a weapon later identified as a .45 caliber handgun. Asked what prompted him to seize the gun, Batten said that he believed it was the tool of a crime, that it was in the possession of a dangerous suspect, and that he was concerned for his safety and the safety of others. A firearms expert testified that the bullets retrieved from Taylor's body and the floor of the automobile "had been fired through this revolver".

## MOTION TO SUPPRESS FIREARM

Defense counsel moved to suppress the warrantless seizure on the ground that "in this case the plain view exception doesn't apply."

■ The Attorney General asks us to hold that Delong had no standing to question the seizure. To establish standing, the burden was on the defendant to show that he had a legitimate expectation of privacy in the automobile. *See Rakas* v. *Illinois*, 439 U.S. 128, 130-31 (1978); *Barnes* v. *Commonwealth*, 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987); *Abell* v. *Commonwealth*, 221 Va. 607, 614, 272 S.E.2d 204, 208 (1980). The parties stipulated at trial that the vehicle was owned by Delong's girlfriend. Absent evidence that the driver of a vehicle has lawful and exclusive possession and control thereof the driver has no standing, simply by virtue of his status as such, to raise a Fourth Amendment challenge.

*United States* v. *Manbeck*, 744 F.2d 360, 374 (4th Cir. 1984), *cert. denied sub nom. O'Hare* v. *United States*, 469 U.S. 1217 (1985). While we recognize the force of the Attorney General's argument that Delong failed to introduce any such evidence, we will consider the defendant's complaint on the merits.

█ A plurality of the Court in *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971), held that the "plain view" exception to the Fourth Amendment warrant requirement applies only when the discovery of the evidence seized is "inadvertent". *Id.* at 469. Delong says that the discovery of the gun was not inadvertent because both officers "went to the car to look for the gun."

A recent decision of the United States Supreme Court adds a gloss to the "inadvertence" component of the "plain view" doctrine. In *Texas* v. *Brown*, 460 U.S. 730 (1983), police officers were stopping automobiles for license checks on a street in an area with a reputation for narcotics traffic. An officer shone his flashlight into the defendant's car, observed a balloon and other items commonly used to package narcotics, and seized the articles as evidence of a crime. The Court held that police had not conducted a *search* within the contemplation of the Fourth Amendment because the defendant had no legitimate expectation of privacy "shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Id.* at 740. Respecting the *seizure,* the Court concluded that, "[w]hatever may be the final disposition of the 'inadvertence' element of 'plain view,' " it was satisfied in that case. *Id.* at 743. "[A]lthough the officers no doubt had an expectation that some of the cars they halted . . . would contain narcotics . . .", the Court ruled that "[t]he 'inadvertence' requirement of 'plain view,' properly understood, was no bar to the seizure here." *Id.* at 743-44.

█ Several years before the Supreme Court's decision in *Brown*, we had published two opinions that addressed the "inadvertency" requirement of "plain view". In *Cook* v. *Commonwealth*, 216 Va. 71, 216 S.E.2d 48 (1975), we upheld a warrantless search and seizure on the ground that "[i]t is not unlawful, but entirely lawful, for a police officer who is on a public street or sidewalk to look, either deliberately or inadvertently, into an automobile parked on the street and to observe what is exposed therein to open view." *Id.* at 73, 216 S.E.2d at 50 (citation omitted). And in *Thims* v. *Commonwealth*, 218 Va. 85, 89, 235 S.E.2d 443, 445

(1977), we said, "We believe . . . that the inadvertence requirement of *Coolidge* is inapplicable in the present case where the law enforcement officer [observed the evidence seized while] standing outside the protected zone of private property . . . ."

Detective Fleming was standing in the road outside Delong's vehicle when he looked through an open window and saw the handle of the revolver. Both he and officer Batten discovered the gun in "plain view" without intruding upon a constitutionally protected zone of privacy. Under *Thims* and *Cook*, the "inadvertence" requirement of *Coolidge* is inapplicable on these facts. Even if otherwise applicable, properly understood, the "inadvertence" requirement was no bar to the seizure in this case. Detective Fleming went to Delong's car "to see what [he] could see." No doubt he had heard the radio report describing the murder weapon and hoped to locate it, but he had no *particular* knowledge that the weapon was in the vehicle. As in *Brown*, the officer in this case may have had a *generalized* expectation that he might observe evidence of a crime, but he did not "know in advance the location of the evidence and intend to seize it." *Coolidge*, 403 U.S. at 470. In other words, the discovery and seizure of the evidence was not a pretext to avoid the Fourth Amendment's warrant requirements. *See Brown*, 460 U.S. at 743.

Yet, we must consider another limitation recently appended to the "plain view" doctrine. In *Brown*, the Supreme Court had expressly declined to "address whether, in some circumstances, a degree of suspicion lower than probable cause would be sufficient basis for a seizure . . . ." 460 U.S. at 742 n.7. In *Arizona v. Hicks*, 480 U.S. ___, 107 S.Ct. 1149 (1987), however, a divided court proclaimed a rule of universal application: in order to invoke the "plain view" doctrine, the police must have had probable cause to believe that the evidence seized was a seizable item, *i.e.*, contraband, the fruit or tools of a crime, or other evidence of a crime.[1]

Although the *Brown* Court eschewed a *per se* rule, in upholding the warrantless seizure in the case before it, the Court applied a probable cause standard defined as follows:

---

[1] We had anticipated that ruling in *Blair* v. *Commonwealth*, 225 Va. 483, 491 n.2, 303 S.E.2d 881, 887 n.2 (1983).

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 U.S. 132, 162 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Brown*, 460 U.S. at 742.

Applying that definition, we are of opinion that the evidence is fully sufficient to show that, when the officers saw the handle of the distinctively large-caliber handgun[2] protruding from beneath the driver's seat, they had probable cause to believe that it was the weapon used to kill Detective Taylor. The crime had been committed only 25 minutes earlier. Delong, the Grand Prix, and the handgun matched the descriptions furnished by eyewitnesses to the crime and relayed by radio to the scene of the seizure. Given probable cause to believe that the handgun was the tool of a crime, the warrantless seizure was lawful, even though, as in *Brown*, the seizure "required a warrantless, physical intrusion into [the] automobile". *Id.* at 741 n.6. We find no merit in the defendant's Fourth Amendment complaint.

## MOTION TO SUPPRESS IDENTIFICATION

Defense counsel also filed a motion *in limine* to suppress Dorothy Smith's identification testimony at trial on the ground that her identification of Delong at the scene of his arrest while he was handcuffed "was in violation of Constitutional principles of law." The trial court denied the motion, and the defendant assigns error to the ruling.

A constitutional question is implicated when it appears that a "one-on-one" confrontation between a witness and a suspect "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the suspect] was denied due process of law." *Stovall* v. *Denno*, 388 U.S. 293, 301-02 (1967). Determination of that question, however, "depends on the totality of the circumstances". *Id.* at 302.

---

[2] Batten described the handle as "a PAGNAR [sic] type grip . . . a black rubber grip".

[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972); *accord Manson* v. *Brathwaite*, 432 U.S. 98 (1977); *see also Townes* v. *Commonwealth*, 234 Va. 307, 331, 362 S.E.2d 650, 663-64 (1987) (this day decided). We will review the totality of the circumstances in light of the several factors listed in *Neil*.

Smith was a disinterested eyewitness to a shocking crime. From the moment she saw the police car in pursuit of another car, her attention was focused upon the drama unfolding before her. When the cars stopped in the intersection a few yards from her car, she saw Delong watching in his rearview mirror as the officer approached. At this point, she got out of her car and was close enough to Detective Taylor to hear the comment he made. And after the investigating officers had arrived, she was able to give them a comprehensive description of the clothing and physical characteristics of the man who had fired the fatal shot and of the car he was driving. Both descriptions proved to be accurate in every detail.

The level of certainty Smith demonstrated at the time of confrontation leaves no doubt that she was utterly convinced. When she arrived with the officer at the scene of the arrest, her exclamation was, "My God, that's the car, and My God, that's him." Finally, applying the last factor mentioned in *Neil*, we note that the length of time between the crime and the confrontation was only 45 minutes. We believe the identification was uncontestably reliable, and we will uphold the trial court's ruling.

## EVIDENTIARY RULINGS

Delong assigns error to certain evidentiary rulings made during the course of the guilt phase of his trial. "The trial court erred," he says, "when it refused to accept the affidavit of Officer Robert Regan." We find no such affidavit of record, and we must assume none was proffered. On brief, the defendant bases his argument on what he terms "a proposed stipulation in regard to Officer Robert

Regan". Apparently, this is a reference to a handwritten statement describing Delong's peaceable submission to a prior arrest by a black officer. It is signed only by defense counsel, it is not a stipulation, and, because the complaint is not fairly comprehended by the assignment of error, it will not be noticed on appeal. Rule 5:17(c).

When the trial court excluded the "proposed stipulation", defense counsel announced that another black police officer was willing to testify to the same effect concerning other arrests. Such testimony, counsel suggested, was relevant to "statements attributed to the accused relating to race and . . . police officers." The trial court advised counsel that such testimony "might be opening Pandora's box" and indicated that he was "not going to allow it in evidence." Counsel raised no objection, proceeded to examine other witnesses on other matters, and rested without calling the officer to the stand. He thus failed to preserve at trial the question he attempts, without benefit of a definitive assignment of error, to argue on appeal. We will not consider the argument. Rules 5:25 and 5:17(c).

Delong also challenges on appeal a conditional evidentiary ruling made during his case-in-chief. Commonwealth's witness Bowers, Delong's front seat passenger, had acknowledged on cross-examination that he had placed his hand on Delong's revolver "[o]ne time". At the conclusion of the Commonwealth's evidence, counsel called a witness intending to show that, at the time of the shooting, Bowers was a convicted felon at liberty on parole and that his handling of a firearm was a circumstance which could result in revocation of his parole. At a side bar conference, defense counsel insisted that the witness, Bowers' parole officer, should be heard because "we are entitled to argue that Bowers fired the gun and . . . we are entitled to show a motive." The trial judge, who earlier had refused to allow the Commonwealth's Attorney to prove that Delong was a convicted felon on parole, warned counsel that if he "opened the door" on the question of motive, he would permit the Commonwealth's Attorney to call Delong's parole officer to establish the same motive on the part of the defendant, *i.e.*, that Delong's purpose in killing Detective Taylor was to avoid arrest and prosecution for violation of the terms of his parole (unauthorized absence from the area to which he was restricted and possession of a firearm).

At this point, defense counsel elected to withdraw the witness without registering any objection to the action of the trial court. Applying Rule 5:25, we will not consider the complaint he urges for the first time on appeal.

## SUFFICIENCY OF THE EVIDENCE

Delong contends that the Commonwealth had the burden "to prove . . . that Mr. Taylor was engaged in performing his official duties" and that the evidence was insufficient to discharge that burden. The defendant misreads the statutory definition of the offense charged in the indictment.

Code § 18.2-31(f) makes the intentional killing of a police officer capital murder when the homicide was committed "for the purpose of interfering with the performance of his official duties". In *Martin* v. *Commonwealth*, 221 Va. 436, 440, 271 S.E.2d 123, 126 (1980), the defendant argued that this section of the statute was unconstitutionally vague in that "it permits imposition of the death penalty without proof that the officer 'was acting in the lawful discharge of an official duty.' " Rejecting that argument, we held that the burden the statute imposes upon the Commonwealth is the burden of proving "that the killing of a law enforcement officer is accompanied by the purpose of interfering with the performance of his official duties." *Id.* In our view, the crucial inquiry contemplated by the statute is not whether the officer was in fact engaged at the time he was killed in performing a law enforcement duty but, rather, whether the killer acted with the purpose of interfering with what he perceived to be an officer's performance of a law enforcement duty.

Our review of the evidence leaves no reasonable doubt that Delong recognized that he was being pursued by an unmarked police car with flashing lights, signalling him to stop. He knew that the driver "pulling [him] over" was a "cop". The jury could believe that Delong heard the same comment Dorothy Smith heard Detective Taylor make, "I really hate to do this to you, man", and that Delong feared that the officer would ask him to produce a driver's license. Delong's license had been suspended or revoked, and Delong had spent the afternoon drinking beer at the Ritz. As he watched the officer approach with the radio in his hand, Delong decided that he was "going to have to shoot" him, and after he did, his own utterance demonstrates the fact that he knew he

had "just killed a goddamn cop" attempting to perform a law enforcement duty.

 The trial court instructed the jury in the language of the statute as we had construed it in *Martin*, and we hold that the evidence was abundantly sufficient to prove the offense charged in the indictment.

## SENTENCE REVIEW

### A. *Passion and Prejudice*

The General Assembly has required this Court to determine in every capital case "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor". Code § 17-110.1(C)(1). The foreman of the jury asked the trial court to explain "the terms of life imprisonment" and "eligibility for parole". The trial court told the jurors "not to concern [themselves] with what happens in the future" and to base their verdict on "the instructions from the Court" and "the evidence before you."

Delong argues that "[a] strong inference can be drawn from the jury's question . . . that it was giving serious consideration to the lesser penalty of life imprisonment." We agree. But in our view, such an inference tends to show that the jury's deliberations were dispassionate, unprejudiced, and guided by earnest consideration of every factor relevant to the portentous decision they were required to make.

We are also required by statute to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2). We consider first whether the sentence was excessive.

### B. *Excessiveness*

The jury fixed Delong's sentence upon a finding of "a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society". Code § 19.2-264.4(C).

From the evidence adduced at the penalty trial, the jury learned about Delong's prior history. At the time Detective Taylor was

murdered, Delong was at liberty on parole. The defendant had been convicted eight years earlier of murder of the second degree and of use of a firearm in the commission of a felony. During the service of his sentence, he was convicted by a jury of a narcotics felony. While still in the penitentiary, he was convicted administratively of another drug offense and two assaults, one upon a prison guard.

In deciding whether a defendant constitutes a future danger to society, a jury is permitted to consider his prior history and, in addition or in the alternative, "the circumstances surrounding the commission of the offense of which he is accused". *Id.* In utter disrespect for constituted authority and in flagrant disregard of parole constraints, Delong acquired a handgun and made an unauthorized pleasure trip from the Tidewater area to Richmond to consort with known felons. Detective Taylor's actions gave Delong no reason to believe that he was being stopped for any purpose other than a traffic offense. Yet, because he realized that the officer would discover his identity and the fact that he was operating a car illegally and, ultimately, that he was violating the conditions of his parole, Delong retrieved his weapon from the floor of the vehicle, watched his unsuspecting victim until he arrived at the driver's window, took deliberate aim, shot him at point-blank range, and threatened to do the same to one of his own companions who dared to protest his barbarous act.

Entirely aside from knowledge of the defendant's prior history, a jury considering such circumstances could reasonably find that Delong "would commit criminal acts of violence that would constitute a continuing serious threat to society", *id.*, and "considering both the crime and the defendant", Code § 17-110.1(C)(2), we hold that the sentence imposed was not excessive. We turn now to the disproportionality review mandated by Code § 17-110.1(C)(2).

## C. *Disproportionality*

Until the adoption of Acts 1914, c. 240, death was the only penalty prescribed for murder of the first degree. Thereafter, although alternative punishment was authorized, juries in this jurisdiction continued to impose the supreme penalty for murder of the first degree when the victim was a police officer. *See, e.g., Gray v. Commonwealth*, 150 Va. 571, 142 S.E. 397 (1928); *Delp v. Commonwealth*, 172 Va. 564, 200 S.E. 594 (1939).

Since the enactment of the current capital murder statutory complex, we have published four opinions in death penalty appeals in which the victim was a police officer. *Beaver* v. *Commonwealth*, 232 Va. 521, 352 S.E.2d 342 (death penalty upheld in murder of State Trooper), *cert. denied*, 483 U.S. ___, 107 S.Ct. 3277 (1987); *Frye* v. *Commonwealth*, 231 Va. 370, 345 S.E.2d 267 (1986) (death penalty fixed by jury vacated for improper argument); *Evans* v. *Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand and appeal*, 228 Va. 468, 323 S.E.2d 114 (1984) (death penalty upheld in murder of deputy sheriff), *cert. denied*, 471 U.S. 1025 (1985); *Martin* v. *Commonwealth*, 221 Va. 436, 271 S.E.2d 123 (1980) (conviction of murder of police officer reversed for error in jury selection). We have also examined the records in capital cases involving the killing of a police officer in which it appeared that a life sentence had been based upon consideration of mitigating circumstances.

None of the capital cases, the records in all of which we have assembled as directed in Code § 17-110.1(E), is factually identical to the case at bar. We are confident in concluding, however, that "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980). Finding no error in the conduct of either phase of the defendant's trial and no reason to disturb the penalty fixed by the jury and imposed by the trial judge, we will affirm the judgments entered below.

*Affirmed.*